[Crim. No. 2712. Fifth Dist. Mar. 14, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN THOMAS WILLIAMS, Defendant and Appellant.

**COUNSEL**

Geoffrey Rotwein, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi and J. Rodney Davis, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HOPPER, J.—**

### FACTS

About 9 o'clock on the morning of January 2, 1976, Mrs. Alicia Murillo was walking down King Street in Bakersfield when a Negro

male came up on her from behind and grabbed her purse out of her hands. In the purse, Mrs. Murillo carried her life savings which consisted of $3,500, accumulated over the past five and a half years from working in the fields. With the exception of one $100 bill all of the money was in $20 bills. In addition, there were three $20's, one $5 bill and five $1 bills, which were for everyday use. After taking the purse, the man crossed King Street and turned into an alley. Mrs. Murillo screamed and ran after the thief until it became apparent that pursuit was hopeless, at which point she called the police.

On that same morning, Jerry LeMaster and Dennis Houk were remodeling a house near the alley mentioned above. About 9 o'clock they heard a woman screaming. About a minute and a half later they saw a man running down the alley. The man then cut through the yard in which LeMaster and Houk were working, passing within five feet of LeMaster. He was running with his arms held over his stomach. LeMaster saw him for a total of 10 to 15 seconds, Houk for a period of about 5 seconds. Less than five minutes later, they saw Mrs. Murillo running down the alley.

About one that afternoon, defendant came to Bill and Garry's Used Cars in Bakersfield, accompanied by his wife and two men. He asked whether he could purchase a 1971 Thunderbird for $1,500 down. Garry Brown, a salesman at the lot, said that that might be possible. At this point, one of defendant's friends pointed out a Pontiac and suggested that defendant get it instead. Defendant asked if he could buy it for $1,000 down and Brown assented. Defendant got in the car and started it up, and then said he would buy it. He made no attempt to test drive the car. Brown testified that in the seven or eight years he had been selling cars only four or five people had agreed to buy cars without test driving them or checking under the hood. Defendant appeared nervous.

Brown, defendant, defendant's wife and one of defendant's friends went into the sales office to arrange the purchase. Brown, who had been warned earlier that day by the police to be on the lookout for the purse snatcher, told his uncle to call the police. Defendant's wife gave defendant some money out of her purse to pay for the car, which consisted entirely of $20 bills. While defendant was counting the money, the police arrived.

By the time the police arrived, defendant had counted out sixty-eight $20 bills ($1,360). In his wife's purse the police found an

additional one hundred $20 bills, one $100 bill, two $5 bills, and four $1 bills. Defendant was then arrested.

Both LeMaster and Houk identified defendant as the man they saw in lineups conducted after defendant's arrest. However, only Houk was permitted to testify as to his lineup identification. LeMaster was not permitted to testify as to his lineup identification because it was a post-complaint lineup in which the defendant was not provided with counsel and had not waived such right. LeMaster was permitted to identify the defendant in court after the trial judge had determined at a hearing that an in-court identification would not be tainted by the lineup. Houk also testified at trial that defendant was the man he had seen. Houk further testified that before attending the lineup he had been shown a photographic lineup containing defendant's picture, and that he had picked out a picture of a person other than defendant and tentatively identified him as the person he had seen.

The chronology of events taking place after defendant's arrest was as follows:

1. Friday, January 2, about 1 p.m.—defendant arrested.

2. Tuesday, January 6, about 6 p.m.—defendant identified by Houk in lineup.

3. Wednesday, January 7—arraignment of defendant and complaint filed against him.

4. Friday, January 9—defendant identified by LeMaster in lineup.

No counsel was provided to defendant at either lineup, nor was he advised of his right to counsel.

Robert P. Molina testified that defendant had worked for him from November 10, 1975, to December 3, 1975, at a wage of $3.10 per hour. Denise Perez, an eligibility worker for the welfare department, testified that defendant on December 30 applied for food stamps, and that he stated on his application that he was receiving unemployment.

The court also ruled that defendant if he testified could be impeached by a 1970 conviction for robbery, but that a 1968 conviction for grand theft was inadmissible. Defendant elected not to testify.

The defendant contends reversible error was committed by the trial court by:

1. Permitting Mr. LeMaster to identify him in court.

2. Admission of the lineup identification and the courtroom identification by Mr. Houk.

3. Admitting evidence of his application for food stamps.

4. Ruling his prior felony conviction admissible.

## DISCUSSION

### I. THE LEMASTER IN-COURT IDENTIFICATION.

Defendant argues that the in-court identification by Mr. LeMaster was tainted per se by the improper lineup, citing the following language from *Kirby* v. *Illinois* (1972) 406 U.S. 682, 683-684 [32 L.Ed.2d 411, 414, 92 S.Ct. 1877]: ". . . Those cases [*United States* v. *Wade* (1967) 388 U.S. 218 (18 L.Ed.2d 1149, 87 S.Ct. 1926) and *Gilbert* v. *California* (1967) 388 U.S. 263, 272 (18 L.Ed.2d 1178, 1186, 87 S.Ct. 1951)] further held that no 'in-court identifications' are admissible in evidence if their 'source' is a lineup conducted in violation of this constitutional standard. 'Only a *per se* exclusionary rule as to such testimony can be an effective sanction,' the Court said, 'to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup.' "

That language only establishes that the testimony is inadmissible per se if its "source" is the improper lineup. Here, the trial court determined that the in-court identification was not tainted by the lineup.

### II. THE HOUK LINEUP.

Defendant argues that the court committed reversible error by admitting into evidence the fact that the witness, Mr. Houk, identified the defendant at a lineup, and by allowing Mr. Houk to identify the defendant in court. The People admit error, but contend that it was harmless beyond a reasonable doubt.

Defendant was not represented by counsel at the lineup nor did he waive such representation. Since the lineup took place before the arraignment, normally he would not be entitled to counsel at that time. (*Kirby* v. *Illinois, supra,* 406 U.S. 682; *People* v. *Chojnacky* (1973) 8 Cal.3d 759, 764-765 [106 Cal.Rptr. 106, 505 P.2d 530].)

However, defendant argues that the lineup took place before his arraignment solely because he had not been properly arraigned without unnecessary delay.

■ The California Supreme Court has pointed out that failure to promptly arraign a defendant is an unlawful practice and such police conduct will be subject to close scrutiny. (*People* v. *Powell* (1967) 67 Cal.2d 32, 61 [59 Cal.Rptr. 817, 429 P.2d 137].) However, in order to obtain reversal of a conviction on this ground, the defendant must show prejudice resulting from the delay. (*People* v. *Combes* (1961) 56 Cal.2d 135, 142 [14 Cal.Rptr. 4, 363 P.2d 4].)

■ We hold that it is prejudicial error to admit into evidence any identification of a defendant made at a post-arrest, pre-complaint lineup when *all* of the following conditions exist:

1. Defendant's counsel is not present and there has not been a waiver of counsel.

2. Law enforcement officers have failed to take the defendant before a magistrate without unnecessary delay.

3. The lineup takes place during the period of unnecessary delay.

Article I, section 14 of the California Constitution provides in part: "A person charged with a felony by complaint subscribed under penalty of perjury and on file in a court in a county where the felony is triable shall be taken without unnecessary delay before a magistrate of that court."

Several statutes supplement this constitutional provision.[1]

---

[1]Among others, these include Penal Code section 825 (in the chapter on arrest by warrant): "*The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays . . .*"

Penal Code section 849 (in the chapter on arrest by whom and how made): "(a) When an arrest is made without a warrant by a peace officer or private person, the person

Several courts have applied the statutes to their own particular facts as to when the 48-hour maximum has been reached. (See, for example, *In re Walker* (1974) 10 Cal.3d 764 [112 Cal.Rptr. 177, 518 P.2d 1129]; *People v. Santos* (1972) 26 Cal.App.3d 397 [102 Cal.Rptr. 678]; *People v. Vick* (1970) 11 Cal.App.3d 1058 [90 Cal.Rptr. 236]; *People v. Lee* (1970) 3 Cal.App.3d 514 [83 Cal.Rptr. 715]; *People v. Taylor* (1967) 250 Cal.App.2d 367 [58 Cal.Rptr. 269] (cert. den., 389 U.S. 995 [19 L.Ed.2d 493, 88 S.Ct. 500]); *People v. Ross* (1965) 236 Cal.App.2d 364 [46 Cal.Rptr. 41].)

We need not concern ourselves with that issue in the instant case because the People concede the lineup took place after the 48-hour period. Furthermore, 48 hours is only an *outside* limit and it does not mean that any delay is reasonable so long as the 48-hour maximum limitation period has not been reached. The record in this case does not show any reason whatsoever for not arraigning the defendant on Monday or Tuesday.

There is no authority to delay for the purpose of investigating the case. ▉ Subject to obvious health considerations[2] the only permissible delay between the time of arrest and bringing the accused before a magistrate is the time necessary: to complete the arrest; to book the accused; to transport the accused to court; for the district attorney to evaluate the evidence for the limited purpose of determining what charge, if any, is to be filed; and to complete the necessary clerical and administrative tasks to prepare a formal pleading. (See *People v. Powell, supra,* 67 Cal.2d 32, 59-61; *Stanley v. Justice Court* (1976) 55 Cal.App.3d 244, 250 [127 Cal.Rptr. 532]; *Dragna v. White* (1955) 45 Cal.2d 469 [289 P.2d 428].)

Furthermore, a delay in arraignment may be relevant in determining whether a civil action for false imprisonment lies. (See *Dragna v. White, supra,* 45 Cal.2d 469; *Kaufman v. Brown* (1949) 93 Cal.App.2d 508 [209 P.2d 156] (*ab initio* doctrine disapproved on other grounds in *Dragna*);

---

arrested, if not otherwise released, shall, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the offense is triable, and a complaint stating the charge against the arrested person be laid before such magistrate."

Compare the American Bar Association Project on Standards for Criminal Justice, Standards Relating to Pretrial Release (Approved Draft, 1968) standard 4.1 ("Without unnecessary delay"); National Advisory Commission on Criminal Justice Standards, Courts, standard 4.5 ("Within six hours").

[2]See, for example, *In re Walker, supra,* 10 Cal.3d 764; *People v. Taylor, supra,* 250 Cal.App.2d 367.

*Peckham* v. *Warner Bros. Pictures, Inc.* (1939) 36 Cal.App.2d 214, 218 [97 P.2d 472] (*ab initio* doctrine also disapproved in *Dragna*).)

■ Penal Code section 145 makes it a misdemeanor to wilfully delay taking an arrested person before a magistrate. As the California Supreme Court said in *People* v. *Powell, supra,* 67 Cal.2d 32, 60: ■ "The principal purposes·of the requirement of prompt arraignment are to prevent secret police interrogation, to place the issue of probable cause for the arrest before a judicial officer, to provide the defendant with full advice as to his rights and an opportunity to have counsel appointed, and to enable him to apply for bail or for habeas corpus when necessary. . . ."

California has not adopted the rule of *McNabb* v. *United States* (1943) 318 U.S. 332 [87 L.Ed. 819, 63 S.Ct. 608]. Consequently, delay in arraignment is only one of the factors to be considered in the admissibility of a confession. A confession made during the delay is not ipso facto inadmissible in California.[3] (*In re Walker, supra,* 10 Cal.3d 764; *People* v. *Combes, supra,* 56 Cal.2d 135; *People* v. *Kendrick* (1961) 56 Cal.2d 71, 85 [14 Cal.Rptr. 13, 363 P.2d 13]; *People* v. *Bashor* (1957) 48 Cal.2d 763 [312 P.2d 255]; *Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 9 [291 P.2d 929]; *People* v. *Stroble* (1951) 36 Cal.2d 615 [226 P.2d 330] (affd., 343 U.S. 181 [96 L.Ed. 872, 72 S.Ct. 599]); *People* v. *Lee, supra,* 3 Cal.App.3d 514; *People* v. *Dosier* (1960) 180 Cal.App.2d 436 [4 Cal.Rptr. 309] (disapproved on other grounds, *People* v. *Butler* (1966) 64 Cal.2d 842 [52 Cal.Rptr. 4, 415 P.2d 819]); *People* v. *Schindler* (1960) 179 Cal.App.2d 584 [3 Cal.Rptr. 865]; *People* v. *Grace* (1958) 166 Cal.App.2d 68, 78 [332 P.2d 811]; *People* v. *Speaks* (1957) 156 Cal.App.2d 25, 37 [319 P.2d 709].)

Unlike confessions, cases where a lineup takes place during a delayed arraignment are practically nonexistent. This case appears one of first impression since *United States* v. *Wade, supra,* 388 U.S. 218 became effective. Two pre-*Wade* cases are noted. *Hernandez* v. *Schneckloth* (9th Cir. 1970) 425 F.2d 89 involved a factual situation similar to the instant case. However, *Wade* was not applicable since the trial preceded the *Wade* decision.[4]

---

[3]For a similar rule in other states, see the Annotation, Admissibility of confession as affected by delay in arraignment of prisoner, 19 A.L.R.2d 1331.

[4]*Wade* is not retroactive. *Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967].

The trial in *People* v. *Boone* (1967) 252 Cal.App.2d 313 [60 Cal.Rptr. 275] also preceded *Wade*. The defendant in that case claimed prejudice since the identification took place during the unreasonable delay period. The court in *Boone* at page 317 said: "Such postulation is destroyed by the rules pronounced in *People* v. *Van Eyk,* 56 Cal.2d 471 . . . and *Rogers* v. *Superior Court,* 46 Cal.2d 3, 10 . . . ."

However, neither *Van Eyk* nor *Rogers* squarely addressed the identification issue. *Rogers* was a confession case. *Van Eyk* involved the ludicrous assertion by the defendant that if he had been out of custody, he could have disposed of contraband before it was seized by the police.

A federal case touches on the issue of this case. (*Williams* v. *United States* (1969) 419 F.2d 740, 742 [136 App.D.C. 158].) However, federal law in this area is based on a judicially declared rule and not on a constitutional ground such as is true in California under article I, section 14 and the supplementary statutes.

■ Although a confession obtained during an improper delay in arraignment is not automatically prejudicial to a defendant, we feel that the situation is otherwise when the accused is subjected to a lineup without counsel during the period of delay. While there is no essential connection between the illegal detention and the confession, the same is not true in the case of the lineup. Had the defendant been arraigned promptly, he would have had an absolute right to counsel at his lineup, and the results of that lineup would have been per se excludable since no counsel was present (*Gilbert* v. *California* (1967) 388 U.S. 263, 272-273 [18 L.Ed.2d 1178, 1186-1187, 87 S.Ct. 1951]).

There are other differences between lineups and confessions. There is no constitutional right to refuse to participate in a lineup since the privilege against self-incrimination (applicable to the confession) does not apply to the lineup. (*United States* v. *Wade, supra,* 388 U.S. 218.) Unlike a confession, almost every identification is pregnant with the seed of error. Ordinarily, a witness can be tested in the courtroom by considering the probability of his "story," by observing his demeanor, and by vigorous cross-examination. This is exceedingly difficult in identification cases since there is no "story" because the evidence of identification rests on a single piece of observation. Furthermore, the witness in an identification situation may be wholly convinced of the correctness of his identification and yet be wrong.

The United States Supreme Court recognized in *United States* v. *Wade, supra,* 388 U.S. at p. 228 [18 L.Ed.2d at p. 1158] that "the confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with enumerable dangers and various factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eye witness identification are well known; the annals of criminal law are rife with instances of mistaken identification."[5]

The inherent deficiencies of the human processes of perception, retention and recall very often result in erroneous eyewitness identification.[6]

---

[5]From the many books and articles in addition to those cited in *Wade* we note the following:

Bedau, The Death Penalty in America (lst ed. 1964); Ehrlich, The Lost Art of Cross-Examination (1945) page 58 (passim) reprinted in Ehrlich, In a Reasonable Doubt (1964), page 31 (passim); 20 Proof of Facts, Eyewitness Identification, page 539 (see particularly, the bibliography, § 17, Legal References and § 17.5, Technical References); Gardner, The Court of Last Resort (1952); Reynolds, Courtroom (1950) chapter 8; Bryan, *Hypnosis and the Unreliability of Eyewitness Testimony,* 10 Cal. Trial Lawyers' J. (Spring 1971) page 50; Cunningham and Tyrrell, *Eyewitness Credibility Adjusting the Sights of the Judiciary,* 37 Ala. Lawyer 563 (the footnotes therein contain an excellent survey of the existing literature particularly in the experimental psychological field as well as the legal); *Protection of the Accused at Police Lineups* (1970) 6 Colum. J. of Law and Soc. Prob. 345 (analysis of what in fact lawyers are doing at lineups); Comment, *The Pretrial Right to Counsel* (1974) 26 Stan. L. Rev. 399; Comment, *Possible Procedural Safeguards Against Mistaken Identification by Eyewitnesses* (1955) 2 UCLA L. Rev. page 552.

As a result of some miscarriages of justice in England, the Home Secretary appointed Lord Devlin to chair a team to inquire into identification evidence. Their inquiry with proposals appears as Report to the Secretary of State for the Home Department of the Departmental Committee on Evidence of Identification in Criminal Cases, (H.C. Apr. 26, 1976). For a critique of the proposals, see, Williams, *Evidence of Identification: the Devlin Report* (July 1976) Criminal L. Rev. page 407; for additional English references, see also Hale, Hanged in Error (1961); Watson, The Trial of Adolph Beck (1924).

Possible mistaken identification in one sense is a demonstration of the general principle of indeterminacy and is not limited to the law. Science faces the same problem.

"Nature . . . escapes accurate determination; in terms of our common sense ideas, by an unavoidable disturbance which is part of every observation . . . we decide, by our selection of the type of observation employed, which aspects of nature are to be determined and which are to be blurred in the course of observation." (Heisenberg, Philosophic Problems of Nuclear Science (1952) 73.)

[6]Buckout, Psychology and Eyewitness Identification, 1 Law and Psych. Rev. (1976) cited in footnote 93 of Cunningham and Tyrrell points out 16 sources of unreliability: insignificance of events; shortness of observation period; observation conditions; stress; physical condition of the observer; prior conditioning and experience; personal biases; needs and motives; desires to be a part of history; length of time from event to test; filling in of details; suggestive test procedure; unfair test construction; conformity, relation to authority figure; and the self-fulfilling factor.

In the instant case, Mr. Houk himself selected the photograph of a person other than the defendant in the period prior to the lineup.

The lineup is a useful tool in the police arsenal of investigatory techniques. Compliance with this opinion will not hamper law enforcement in any way. Evidence obtained from a properly conducted lineup which takes place *before* a timely held arraignment will still be clearly admissible, whether or not counsel was present. The per se exclusionary rule as to lineup identification does not apply to a lineup preceding arraignment. (*People* v. *Chojnacky, supra,* 8 Cal.3d 759, 764.) The holding herein does provide in its limited circumstances a remedy for noncompliance with the law on arraignment without undue delay and thus may dispel to some extent the charge that the "promptness requirements in the states are a classic illustration of a right without remedy." (Abrams, *Prosecutorial Charge Decision Systems,* 23 UCLA L.Rev. 1, 31.)[7]

When the lineup is tainted, the in-court identification must not be admitted prior to judicial determination that it was of independent origin. (*Gilbert* v. *California* (1967) 388 U.S. 263, 272 [18 L.Ed.2d 1178, 1186, 87 S.Ct. 1951].) In the case before us, the trial judge having concluded that the lineup was proper did not proceed to hold a hearing as to the in-court identification. Consequently, the in-court identification by Mr. Houk was constitutionally improper under *Gilbert.*

The respondent concedes there was constitutional error in admitting the lineup identification by Mr. Houk, but contends that the evidence absent the identification testimony of Mr. Houk was sufficient to establish that the defendant was guilty beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

Respondent relies on *People* v. *LeBlanc* (1972) 23 Cal.App.3d 902 [100 Cal.Rptr. 493]; *People* v. *Evans* (1971) 16 Cal.App.3d 510 [94 Cal.Rptr. 88]; and *People* v. *Lyons* (1971) 18 Cal.App.3d 760 [96 Cal.Rptr. 76].

These are all distinguishable on their facts from the instant case and involve considerably more than identification. *LeBlanc* involved an identification of a robber who had been on several occasions previously a

---

[7]We acknowledge that Professor Abrams might not agree with the effectiveness of our remedy.

customer of the store where the robbery took place and the defendant had odd hair styling. *Evans* involved a case in which in addition to in-court identification, there were *confessions* by the defendant. In *Lyons,* in addition to another identification, there were three *confessions* of the defendant.

There was other circumstantial evidence of guilt in this case. The stolen money and the money in the hands of the defendant and his wife appear to be the same. LeMaster did identify the defendant. While one identification may be sufficient under particular circumstances such as in *LeBlanc* to convict, we are unable to conclude that the error in admitting the identification by Mr. Houk was harmless beyond a reasonable doubt. The persuasive effect of eyewitness identification and testimony upon a jury is well documented.[8] We believe that the identification by Mr. Houk was critical to the jury in this case. The jury obviously gave it great consideration since the record shows that the jury asked to have the testimony of Mr. Houk reread three times.

To guide the trial court in any retrial of the defendant, we discuss the other charges of error.

## III. THE FOOD STAMPS.

Over defendant's objection, the court admitted into evidence the fact that the defendant had applied for food stamps and that he had stated on the application that he was unemployed. Defendant asserts a statutory privilege under Welfare and Institutions Code section 10850.[9]

Respondent concedes the court erred in admitting the evidence but contends that the error was harmless. We hold that this admission of evidence was error, but in light of the decision to reverse this case, we need not determine whether such an error, had it been the only one at the trial, would have been harmless.

---

[8]See, the authorities cited in Cunningham and Tyrrell, *supra,* page 564, footnote 4.

[9]That section states in the relevant part: "Except as otherwise provided in this section, all applications and records concerning any individual made or kept by any public officer or agency in connection with the administration of any provision of this code relating to any form of public social services for which grants-in-aid are received by this state from the United States government shall be confidential, and shall not be open to examination for any purpose not directly connected with the administration of such program . . . ."

Prior to 1975 the statute did make the information available to the district attorney for the official conduct of his office.

IV. THE PRIOR FELONY.

We believe that there may have been error in admitting the prior robbery conviction. Since this matter is being reversed for other reasons, we do not discuss that issue except to cite as a basis of our position *People* v. *Rist* (1976) 16 Cal.3d 211 [127 Cal.Rptr. 457, 545 P.2d 833].[10]

The judgment of conviction is reversed.

Brown (G. A.), P. J., and Franson, J., concurred.

---

[10]We recognize that the waters are somewhat muddied in applying *Beagle.* The trial judge (unless he is going to be Procrustean in outlook which would itself violate the antirigidity concept of *Beagle*) may wish for the advent of a guide to the law on prior felonies much as the natural scientists received after Darwin's famous voyage to South America and the Galapagos Islands on H.M.S. *Beagle.*