[Crim. No. 15000. Fourth Dist., Div. One. Sept. 15, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT GENE COOK, Defendant and Appellant.

COUNSEL

Frank Offen, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Garrett Beaumont and Linda A. Cabatic, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WIENER, J.**—Defendant Robert Gene Cook appeals after a jury convicted him of burglarizing an attached garage and enclosed patio at the residence of Michael Van Horn in Stanislaus County. We reject his several contentions and consequently affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Michael Van Horn was awakened in the early morning hours of August 6, 1980, by loud knocking on his back door. Without opening the door, Van Horn looked through the window and saw a man he later identified as George Billingham standing outside. Billingham explained in a loud voice that he was lost, and asked for directions to Oakdale. He then changed his mind and asked how to get to Woodward Reservoir. Van Horn provided the directions. During the conversation, Billingham turned his head periodically looking in the direction of Van Horn's garage, which was connected to the house.

After Billingham left, Van Horn heard an engine start and, looking through the front window of his house, saw an older model half-ton van in poor condition drive out of his driveway and down the street. Apparently suspicious, Van Horn phoned the sheriff's department before he returned to bed.

On awakening the next morning, Van Horn noticed several items missing from an enclosed patio area next to his garage including two chairs and a clock radio. He also discovered the front door to the garage was open and that a tool box had been taken from the garage. He immediately notified the sheriff's office of the burglary.

Shortly thereafter, Deputy Sheriff Welch arrived to interview Van Horn. Van Horn explained about his nocturnal visitors, described the van he had seen and provided Welch with a description of the stolen property. Welch proceeded immediately to Woodward Reservoir, encountering a van matching Van Horn's description. He approached the van, looked through the front windshield and observed two chairs, a clock radio and a tool box of the types which Van Horn reported stolen. In addition, Welch saw three persons sleeping inside the van. One of the occupants, Debra Coe, awoke and left the van via the rear doors. Welch asked her to awaken the other two occupants and Coe complied. Welch went to the van's rear doors and knocked. Someone inside said, "Yeah." Welch then opened the doors and defendant Robert Gene Cook emerged along with a companion, Elvis Goss. Welch asked to whom the van belonged and Cook replied it was his. Welch asked for permission to search the van and Cook consented as long as Welch did not "tear it up."

George Billingham then approached Welch and asked what was going on. After being informed that all four were together, Welch explained they would have to be detained for a burglary investigation. Following a search for weapons, Welch placed all four individuals in the back of his patrol car. He then entered the van, seized the two chairs, the clock radio and the tool box, and radioed a request that Van Horn meet him at Woodward Reservoir. Van Horn arrived five minutes later, identified his property, and confirmed that Billingham was the person who had appeared at his door earlier that morning. The four individuals were then arrested. After waiving his *Miranda* rights, Cook told Welch that the tool box belonged to a friend, and that the chairs and clock belonged to his cousin who was camping at the reservoir.

Cook declined to give his cousin's name. He also denied having stopped earlier that morning to ask directions to Woodward Reservoir.

Cook was booked into the Stanislaus County jail at 12:40 that afternoon. On the following day, August 7, at approximately 1:30 p.m., Cook, Billingham and Goss were brought to a room in the jail to enable Detective Larry Hersey to photograph the soles of their shoes. This was necessary because several different shoeprints had apparently been found near the Van Horn garage. During the photographic session, one of the suspects asked Hersey what he was doing and why they were being held. Hersey explained they had been arrested on suspicion of burglarizing the Van Horn residence. Goss then remarked about some hitchhikers they had picked up, intimating the hitchhikers might somehow be involved in the burglary. Cook added that he also remembered the hitchhikers. Hersey responded that the report on the incident mentioned nothing about hitchhikers in Cook's van. Cook then started to explain but Hersey cut him off, noting if Cook wished to say anything, he would have to be advised of his *Miranda* rights. When Cook indicated a desire to talk, Hersey gave him the *Miranda* warning. Cook followed the warning with a statement concerning two hitchhikers who they picked up shortly after leaving the Van Horn home, to which they had gone seeking directions. The hitchhikers were allegedly dropped off before they reached the Woodward Reservoir. Cook did not recall seeing the hitchhikers carrying anything other than perhaps a sleeping bag. During Cook's recitation, Billingham and Goss indicated agreement with the substance of Cook's story.

Cook and Billingham were both charged with the burglary. Cook was tried separately. He testified at trial and admitted that the two previous statements he gave to police were fabrications. His testimony admitted stopping at the Van Horn house for directions. While Billingham went to the door, Goss and Coe allegedly left to go to the bathroom. Cook said he got out to fix a windshield wiper. When Goss and Coe returned, Cook saw them throwing several items into the back of the van. He admitted suspecting the items were stolen, but refrained from saying anything because he didn't want to get involved. He explained he lied to police in his two previous statements because he did not want to implicate the others, and because he was concerned as to what they might do to him if he did.

The jury convicted Cook of first degree burglary. (Pen. Code, §§ 459 and 460.)

### DISCUSSION

Cook's major contention relates to an unreasonable delay in arraignment during which an allegedly involuntary statement was made. He also alleges an unreasonable search of his van, an erroneous instructional omission, inadequate assistance of counsel and the insufficiency of the evidence to sustain a first degree burglary conviction. We address these contentions seriatim.

*Unreasonable Delay in Arraignment*

Penal Code section 825 provides in relevant part, "The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays . . . ." (See also Cal. Const., art. I, § 14.) The Supreme Court has emphasized, however, that "[t]hese provisions do not authorize a two-day detention in all cases. Instead, 'a limit [is placed] upon what may be considered a necessary delay, and a detention of less than two days, if unreasonable under the circumstances, is in violation of the statute' and of the Constitution. (See *Dragna* v. *White* (1955) 45 Cal.2d 469, 473 [289 P.2d 428]; *People* v. *Stroble* (1951) 36 Cal.2d 615, 624-626 [226 P.2d 330].) . . . '[T]he only permissible delay between the time of arrest and bringing the accused before a magistrate is the time necessary: to complete the arrest; to book the accused; to transport the accused to court; for the district attorney to evaluate the evidence for the limited purpose of determining what charge, if any, is to be filed; and to complete the necessary clerical and administrative tasks to prepare a formal pleading. [Citations.]' (*People* v. *Williams* (1977) 68 Cal.App.3d 36, 43, fn. omitted [137 Cal.Rptr. 70].)" (*People* v. *Thompson* (1980) 27 Cal.3d 303, 329 [165 Cal.Rptr. 289, 611 P.2d 883].)

■ In this case, the complaint charging Cook with burglary was filed at 8:01 a.m. on Friday, August 8. He was presumably arraigned shortly thereafter, meaning that approximately 45 hours elapsed between his arrest and the arraignment. Although this period falls within the two-day statutory maximum, Cook argued to the trial court there was no reason he could not have been arraigned on the morning of August 7. He renews his objection here, pointing to the fact the photographic session held later on the morning of the 7th resulted in his making inconsistent statements which were used to impeach his testimony at trial. Cook complains his statements were not totally voluntary since

they constitute a product of the arguably unreasonable delay in arraignment. He contends that had he been arraigned on the 7th and a lawyer appointed, he would not likely have made any incriminating statements while the shoe photos were being taken.

While the rule is arguably different in cases where the delay exceeds the two-day statutory period (see *People* v. *Williams* (1977) 68 Cal. App.3d 36, 43 [137 Cal.Rptr. 70]), Cook bears the burden of producing evidence suggesting that the arraignment delay in this case was unreasonable.[1] (*People* v. *Johnson* (1978) 85 Cal.App.3d 684, 689 [149 Cal.Rptr. 661].) We believe he has met that burden here to the best of his ability by pointing to the fact that all of the evidence linking him to the burglary was in the possession of the sheriff's office at the time Cook was arrested. The circumstances of this case were relatively simple, allowing an inference that the 45-hour delay was not necessary for case evaluation and the performance of administrative details. (See *People* v. *Williams, supra,* 68 Cal.App.3d at p. 43.)

Faced with this showing, the People were unable to demonstrate any justification for their failure to arraign Cook at an earlier time. The only explanation proffered was that the case had been assigned to a detective who was on vacation. But in *People* v. *Thompson, supra,* 27 Cal.3d at page 329, the court concluded that a police officer's need for sleep was insufficient reason to delay a defendant's arraignment. With that mandated premise, a sheriff's detective's vacation provides no greater justification.

As *Thompson* noted, however, "[E]ven if a [statement] occurs during a period of illegal detention under section 825, that fact does not render it inadmissible. A delay in arraignment is treated 'as only one of the factors to be considered in determining whether the statement was voluntarily made.' [Citations omitted.]" (*Ibid.*) It is incumbent on the defendant to show an "essential connection" between the delay and the statement if the statement is to be excluded. (*Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 10 [291 P.2d 929]; *People* v. *Thompson, supra,* 27 Cal.3d at pp. 329-330; contra *McNabb* v. *United States* (1943) 318 U.S. 332, 345 [87 L.Ed. 819, 826, 63 S.Ct. 608].) As was the case in *Thompson,* the "essential connection" is lacking here. The record does

---

[1]Although *People* v. *Thompson, supra,* 27 Cal.3d at pages 328-329 involved a less-than-two-day delay, the case did not discuss which party bears the burden of producing evidence on the issue.

not suggest the arraignment delay was effected for the purpose of eliciting incriminating statements from Cook. Moreover, like the situation in *Thompson*, Cook volunteered the statements to Detective Hersey; they did not result from police interrogation. Finally, the exculpatory nature of Cook's statements strongly supports the conclusion that they were voluntarily made.[2] They could only be used against him at trial because they were inconsistent with the version of the facts he related during his trial testimony. Under these circumstances, Cook's statements to Detective Hersey were properly admitted. (See *Thompson, supra,* 27 Cal.3d at p. 330.)

## *Suppression of Evidence*

■ Cook next contends the court erred in refusing to suppress evidence seized from his van as the product of an unreasonable search. This claim is specious insofar as it suggests that Deputy Sheriff Welch did not have reason to detain the van's occupants or probable cause to seize the items matching the description of the property taken in the burglary. Van Horn's description of the van, its presence at Woodward Reservoir and the fact it apparently contained the items of stolen property mandated Welch's detention of the van's occupants. (See *People* v. *Ramos* (1982) 30 Cal.3d 553, 569-570 [180 Cal.Rptr. 266, 639 P.2d 908], app. pending U.S. Supreme Ct.) Cook's consent obviated any need for Welch to obtain a search warrant, even if such requirement otherwise existed. (Cf. *Wimberly* v. *Superior Court* (1976) 16 Cal.3d 557, 563 [128 Cal.Rptr. 641, 547 P.2d 417].)

■ Cook also relies, however, on Penal Code section 844's knock and notice requirement.[3] He asserts that because several of the occupants were sleeping in the van, it constitutes a "house" within the meaning of Penal Code section 844 and Welch therefore violated the statute by failing to identify himself and explain his purpose before entering. (See *People* v. *Baldwin* (1976) 62 Cal.App.3d 727, 739 [133 Cal.Rptr. 427].) We assume without deciding the question that the purposes underlying Penal Code section 844 may support its application to motor vehicles being used as a residence. Nevertheless, Cook's reliance on the knock and notice requirement here is misplaced. Welch's aim

---

[2]This factor contrasts with *Thompson*—the statement there was a full confession—and to that extent suggests an even greater degree of voluntariness.

[3]Section 844 provides: "To make an arrest, a ... peace officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

was to investigate further in order to ascertain whether the property inside the van belonged to Van Horn and what connection the various individuals present had to the property. He did not open the door in order to gain "admittance" to the van but rather to get the occupants outside in order that he might talk with them, and he in fact never entered the van until Cook gave his consent for the search. We accordingly conclude that Penal Code section 844 is inapplicable under the circumstances of this case. Cook's motion to suppress evidence was properly denied.

*Circumstantial Evidence Instruction*

■ Relying on *People* v. *Yrigoyen* (1955) 45 Cal.2d 46, 49-50 [286 P.2d 1] and *People* v. *Crisel* (1955) 137 Cal.App.2d 275, 276 [290 P.2d 9], Cook argues that the trial court erred in failing to instruct the jury pursuant to CALJIC No. 2.02 which discusses the effect of circumstantial evidence in proving a specific mental state necessary to sustain conviction of the crime.[4] He admits, however, that the jury was instructed pursuant to CALJIC No. 2.01 on the general use of circumstantial evidence to prove elements of the crime.[5]

[4]CALJIC No. 2.02 reads as follows: "The [specific intent] [or] [mental state] with which an act is done may be shown by the circumstances surrounding the commission of the act. But you may not find the defendant guilty of the offense charged ... unless the proved circumstances not only are consistent with the theory that he had the required [specific intent] [or] [mental state] but cannot be reconciled with any other rational conclusion.

"Also, if the evidence as to [any] such [specific intent] [or] [mental state] is susceptible of two reasonable interpretations, one of which points to the existence of the [specific intent] [or] [mental state], and the other to the absence of the [specific intent] [or] [mental state], it is your duty to adopt that interpretation which points to the absence of the [specific intent] [or] [mental state]. If, on the other hand, one interpretation of the evidence as to such [specific intent] [or] [mental state] appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable."

[5]CALJIC No. 2.01 provides: "However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.

"Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.

"Also, if the circumstantial evidence [as to any particular count] is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is your duty to adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt.

"If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable."

A side-by-side comparison of the two instructions reveals they are largely identical. CALJIC No. 2.01 is simply more general in that it applies to circumstantial evidence used to prove any element of the crime, and is not limited to a specific-mental-state element. As the Use Note to CALJIC No. 2.02 indicates, that instruction "... is designed for use *instead of* Instruction 2.01 ... [when] the only element of the offense which rests substantially or entirely on circumstantial evidence is the element of specific intent or mental state." (Italics added.) The trial court here reasonably concluded that Cook's mental state was not the only element of the crime affected by circumstantial evidence. Specifically, there was no direct evidence that Cook himself entered the Van Horn residence or even knew that his companions were doing so. There was accordingly no error in substituting CALJIC No. 2.01 for CALJIC No. 2.02.

*Ineffective Assistance of Counsel*

■ Relying on a history of alcohol abuse and his testimony that he had had a drink on the evening of the burglary, Cook claims his trial counsel rendered ineffective assistance in failing to investigate a diminished capacity defense. He is unable to sustain his burden of proof (see *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]), however, since the record is devoid of evidence suggesting a failure to investigate. In fact, in response to a question from the trial court, Cook's trial counsel acknowledged awareness of the potential defense but specifically declined diminished capacity instructions as a deliberate choice of trial tactics. On this record, Cook does not appear to have received ineffective assistance of counsel.

*Appropriate Degree of Burglary*

■ Cook's final claim asserts he should have been convicted at most of second degree burglary because the attached garage and enclosed patio of the Van Horn residence do not constitute "an inhabited dwelling house" within the meaning of Penal Code section 460. The problem with the argument, however, is that neither the garage nor the patio are separate structures; rather, they are an integral part of the Van Horn residence, entry into any part of which would be sufficient to constitute a burglary. (Cf. *In re Christopher J.* (1980) 102 Cal.App.3d 76 [162 Cal.Rptr. 147].)

Cook's reliance on *People* v. *Picaroni* (1955) 131 Cal.App.2d 612 [281 P.2d 45] is misplaced. That case involved the entry of an unattached garage not normally inhabited. In the situation where the garage is an attached and integral part of the house, it is simply one room of several which together compose the dwelling. This is especially true where, as in this case, the garage can be reached through an inside door connecting it to the rest of the residence. The statistically greater probability that an occupant of the house may be in the attached garage or enclosed patio justifies the Legislature's decision to treat burglaries of such locations more severely. Cook was properly convicted of first degree burglary.

### DISPOSITION

The judgment is affirmed.

Cologne, Acting P. J., and Staniforth, J., concurred.