[No. A060423. First Dist., Div. One. May 27, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
MERRICK A. WISE, Defendant and Appellant.

**COUNSEL**

Roger A. Stoll, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**DOSSEE, J.**—Defendant was convicted in a court trial of first degree burglary. He raises two issues on appeal: (1) whether the prosecution exercised due diligence to obtain the presence of its chief witness at trial; (2) whether defendant's entry through a locked gate onto an outdoor stairway constitutes burglary.

FACTS

*The Offense*

On September 8, 1992, between 2 a.m. and 3 a.m., Richard Leagan looked out his window and saw appellant cutting a hole in the gate at the front of his apartment building. The building is a three-story, three-unit, Victorian-style building. A stairway leads from the sidewalk to a small porch from which the three apartment doors open. The stairway and porch are enclosed on three sides and roofed. The opening at the bottom of the stairway is secured by a wrought iron gate covered in iron mesh. The gate rests on the third step and extends to the roof. There are apparently doorbell buzzers on the gate for the three apartments. The gate is kept locked.

After observing defendant cutting through the iron mesh on the gate, Leagan called the police. When he returned to the window a few seconds

later, Leagan saw defendant inside the gate, standing on the stairway. There were two bicycles on the stairway chained to the railings. Leagan saw defendant trying to break the lock on one of the bicycles. He seemed to be using the ear stem of an eyeglass frame. Defendant then tried the lock on the second bicycle, but he was equally unsuccessful. Defendant then walked out the gate and crossed the street. At no time did he move onto the porch or toward the apartment doors.

The police arrived and began to question a man who generally fit the description Leagan had given the dispatcher. Leagan saw that they had the wrong man, so he ran outside and pointed out defendant, who was walking away from the scene.

Defendant was arrested and admitted cutting the hole in the gate. He claimed that a man named "Elroy" had paid him $10 to cut through the gate. An eyeglass stem was found just inside the gate and a pair of wire cutters were found in the bushes across the street.

*Efforts to Locate the Witness*

Richard Leagan testified at length at the preliminary hearing held on October 8, 1992. On October 23, 1992, the prosecution prepared a subpoena for Leagan, and service was attempted on November 2, 3, and 11 at 285 Church Street, the crime site. The subpoena service agent concluded Leagan did not reside at the address. On November 18, a second subpoena was issued, and on November 23, service was attempted at 879 Haight Street. Again the subpoena service agent reported Leagan did not reside at this address.

On December 2, Michael Koppel, an investigator from the district attorney's office, was assigned to look for Leagan. He went to Leagan's "last known address," 573 Scott Street, an apartment building, but Leagan's name did not appear on the computer listing for the building. Inspector Koppel was unable to get into the Scott Street building to determine if there was a building manager. On December 3, the investigator went to the Church Street and Haight Street addresses, but no one answered. At all three places, Inspector Koppel left his business card, but Leagan never called. Inspector Koppel did not speak to any occupants of any of the buildings.

Inspector Koppel ran a computer check for Leagan but found no entry. Inspector Koppel contacted the United States postal inspector and was told there was no forwarding address from any of the three addresses for Leagan. On December 8, the day before trial, Inspector Koppel checked for Leagan

at the county jail, the coroner's office and San Francisco General Hospital, but could not find him.

At the hearing on the availability of Leagan, defense counsel asserted that Leagan was on probation. The district attorney responded that he had checked Leagan's criminal record and it revealed that Leagan had been placed on court (unsupervised) probation in May 1992. The trial court noted, therefore, that the probation department would have no record of his whereabouts.

## DISCUSSION

### I. *Due Diligence*

Over defendant's objection, the testimony of Richard Leagan given at the preliminary hearing was used at trial, as the witness could not be located. ▮ Defendant reiterates on appeal his argument below that the prosecution failed to show due diligence in its efforts to locate Leagan.

▮ Evidence Code section 1291 permits the use of former testimony only if the witness is unavailable. Evidence Code section 240 defines "unavailable" to mean the declarant is absent from the hearing "and the proponent of his or her statement has exercised reasonable diligence but has [failed] to procure his or her attendance by the court's process."

Whether due diligence was demonstrated is a factual question dependent on the circumstances in each case. (*People* v. *Cummings* (1993) 4 Cal.4th 1233, 1296 [18 Cal.Rptr.2d 796, 850 P.2d 1], cert. den. __ U.S. __ [128 L.Ed.2d 219, 114 S.Ct. 1576].) The long-established rule has been that the trial court's ruling will not be disturbed absent an abuse of discretion. (*People* v. *Jackson* (1980) 28 Cal.3d 264, 312 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73]; *People* v. *Palacios* (1968) 261 Cal.App.2d 566, 573 [68 Cal.Rptr. 137] disapproved on other grounds in *People* v. *Navarro* (1972) 7 Cal.3d 248, 271, fn. 20 [102 Cal.Rptr. 137, 497 P.2d 481].) More recently, however, the Supreme Court has suggested, without deciding, that the appellate court should independently review the record. (*People* v. *Cummings, supra,* 4 Cal.4th at p. 1296; *People* v. *Price* (1991) 1 Cal.4th 324, 424 [3 Cal.Rptr.2d 106, 821 P.2d 610], cert. den. __ U.S. __ [121 L.Ed.2d 102, 113 S.Ct. 152]; *People* v. *Hovey* (1988) 44 Cal.3d 543, 563-564 [244 Cal.Rptr. 121, 749 P.2d 776].) ▮ In the present case, under either the "abuse of discretion" standard or the "independent review" test we conclude reasonable diligence was shown.

Defendant contends the prosecution's efforts were inadequate in two respects: First, the prosecution failed to keep track of Leagan after the preliminary hearing; and, second, the prosecution made only feeble efforts to find Leagan's correct address.

On the first point, defendant relies on the Supreme Court's statement that when a witness's testimony is vital to the prosecution's case, "the People must take reasonable precautions to prevent the witness from disappearing." (*People* v. *Hovey, supra,* 44 Cal.3d at p. 564, citing *People* v. *Louis* (1986) 42 Cal.3d 969, 991 [232 Cal.Rptr. 110, 728 P.2d 180].)

Yet, *People* v. *Louis, supra,* 42 Cal.3d 969, the case upon which defendant relies, involved a witness who was known to be a flight risk. The witness was facing a felony theft charge and was awaiting sentence in another case. He was released from jail on his own recognizance to spend the weekend before sentencing with a friend and disappeared. The court held no due diligence was shown, as the People did not obtain the name or address of the friend and thus, did not keep the witness under surveillance. (*Id.,* at p. 992.)

In the present case, in contrast, the witness was a citizen-victim. He was not facing criminal charges and the record does not indicate any reason for the prosecution to believe he would disappear. Indeed, in *People* v. *Hovey, supra,* the Supreme Court distinguished *Louis,* noting that "we could not properly impose upon the People an obligation to keep 'periodic tabs' on every material witness in a criminal case, for the administrative burdens of doing so would be prohibitive. Moreover, it is unclear what effective and reasonable controls the People could impose upon a witness who plans to . . . simply 'disappear,' long before a trial date is set." (44 Cal.3d at p. 564.)

As to the second point, the prosecution's efforts to locate Leagan were reasonably diligent. The People attempted three times to serve Leagan at his Church Street address. They also tried a Haight Street address and the Scott Street address, believed to be Leagan's last known address. Inspector Koppel contacted the post office, the local jail, hospital and coroner.

Defendant's contention that the People should have done more—e.g., contacting the Department of Motor Vehicles or Social Security—is irrelevant to our analysis. "That additional efforts might have been made or other lines of inquiry pursued does not affect [our] conclusion. . . . It is enough that the People used reasonable efforts to locate the witness." (*People* v. *Cummings, supra,* 4 Cal.4th at p. 1298; see also *People* v. *Guiterrez* (1991) 232 Cal.App.3d 1624, 1641 [284 Cal.Rptr. 230].)

## II. *Entry Into Building*

Penal Code section 459 defines burglary as follows: "Every person who enters any house, room, apartment, . . . or other building . . . with intent to

commit grand or petit larceny or any felony is guilty of burglary."
 The question we must decide is whether defendant entered the building when he broke through the gate.

 It is well settled that an entry occurs for purposes of the burglary statute if any part of the intruder's body, or a tool or instrument wielded by the intruder, is "inside the premises." (*People* v. *Failla* (1966) 64 Cal.2d 560, 569 [51 Cal.Rptr. 103, 414 P.2d 39]; *People* v. *Aguilar* (1989) 214 Cal.App.3d 1434, 1436 [263 Cal.Rptr. 314]; *People* v. *Nible* (1988) 200 Cal.App.3d 838, 843[246 Cal.Rptr. 119].) Two separate approaches have been taken by the courts to determine whether an entry was effectuated. The first approach examines whether the defendant crossed the boundary separating the interior air space of the building from the outdoors. The second approach looks to the reasonable expectations of the building occupants to be free from an intrusion. Both approaches lead us to the same result.

### A. *The Boundary Approach*

The boundary approach is exemplified by *People* v. *Ravenscroft* (1988) 198 Cal.App.3d 639, 643-644 [243 Cal.Rptr. 827], in which the court held that insertion of an automatic teller machine card into a bank automatic teller machine constituted an entry because the air space of the bank had been violated. The defendant broke the plane of the bank building. Similarly, in *People* v. *Osegueda* (1984) 163 Cal.App.3d Supp. 25, 32 [210 Cal.Rptr. 182], the court found an entry occurred when the air space of a store was penetrated by the defendant's drilling tool.

This approach conforms to the early common law rules set forth by the commentators. One treatise writer explained that the test for an entry is whether "any part of the defendant's person passes the line of the threshold" of the building. (3 Wharton, Criminal Law (14th ed. 1980) § 332, p. 202.) Another stated that the requirement for entering is satisfied if any part of the intruder's body "passes over the line of the door or window." (3 Underhill's Criminal Evidence (5th ed. 1957) § 716, pp. 1671-1672.)

 In the present case, use of this approach requires a determination of the boundaries of the building: is the stairway part of the interior air space of the apartment building, or is it part of the exterior? On the one hand, it could be argued that the stairway is outside the building. The threshold line of the building is located at the doorways into the apartments. One who stands on the stairway would not be considered "inside" the building under ordinary parlance. On the other hand, it is arguable that the presence of the locked gate extends the outer boundary of the building. The gate creates an enclosure consisting of the stairway and porch, covered by the building's roof,

which forms an integral part of the building, similar to a foyer. The threshold line of the building, then, is located at the gate.

The case law supports a conclusion that the stairway is within the boundary of the building. In *People* v. *Franco* (1926) 79 Cal.App. 682 [250 P. 698], the defendant took some shoes from showcases which were fastened along the walls and sides of a stairway leading from the sidewalk down to the store. The court held that even though the showcases were located outside the store, the entry constituted a burglary because the showcases were attached to the store and covered by the roof of the building. "They are therefore in legal effect part of the store proper . . . ." (P. 684; see also *People* v. *Jackson* (1933) 131 Cal.App. 605 [21 P.2d 968] [entry into a showcase attached to entrance of a clothing store and sheltered by roof and side walls of the store].) In *In re Christopher J.* (1980) 102 Cal.App.3d 76 [162 Cal.Rptr. 147], the defendant minor entered a carport which was walled on one side and roofed. The court held entry into the carport constituted burglary where the carport was "attached to and an integral part of the dwelling house." (*Id.*, at pp. 78-79.)

And in *People* v. *Brooks* (1982) 133 Cal.App.3d 200, 207-208 [183 Cal.Rptr. 773] the defendant entered a loading dock which was walled on two sides by the walls of Boys Market and on two sides by a chain link fence. The court held the loading dock could be subject to a burglary because it was an integral part of the structure containing the market: "The evidence establishes that the loading dock is not some sort of a free standing building but a structure attached to and an integral part of the Boys Market building. . . . The loading dock area is a functional part of the Boys Market particularly its warehouse and receiving operation." (133 Cal.App.3d at p. 207; cf. *People* v. *Coutu* (1985) 171 Cal.App.3d 192 [217 Cal.Rptr. 191] [entry into storeroom connected to main house by breezeway and sharing common roof was first degree burglary]; *People* v. *Moreno* (1984) 158 Cal.App.3d 109, 112 [204 Cal.Rptr. 17] [entry into garage attached to house and under same roof, although no connecting door]; *People* v. *Cook* (1982) 135 Cal.App.3d 785, 795-796 [185 Cal.Rptr. 576] [entry into garage attached to house with connecting door].)

Using this same reasoning, we conclude that the entry into the stairway constituted burglary. The stairway is attached to the apartment building and covered by the building's roof. It forms an integral part of the building.

Defendant's entry through the gate into the stairway was a penetration of the outer boundary of the building.[1]

## B. *Reasonable Expectations Approach*

More recently, one court has taken a different approach, rejecting the foregoing "boundary" approach as inadequate and imprecise. Instead, the court held the proper focus is on whether the property owner or inhabitant would reasonably expect an intrusion into the space. (*People* v. *Nible, supra,* 200 Cal.App.3d at pp. 844-845.)

In *Nible* the defendant pulled back the window screen but did not penetrate further. He did not penetrate the plane formed by the window itself. Although the court noted that an entry could arguably be found even under the "air space" analysis, as "a window screen contains the outer boundary of a building's air space," the court went on to examine "whether the nature of a structure's composition is such that a reasonable person would expect some protection from unauthorized intrusions." (200 Cal.App.3d at p. 844.) The court concluded that because the window screen was a permanent part of the dwelling which the inhabitants relied upon for protection, opening the screen was a violation of the security of the house and constituted an entry for purposes of the burglary statute.[2]

Under this second approach, using the reasonable expectation test, we would also conclude that an entry was made. The metal gate is obviously a permanent part of the dwelling, relied upon by the building occupants for protection against unauthorized intrusions. Defendant's act of cutting and

---

[1]Penal Code section 460 specifies the degrees of burglary and states that "[e]very burglary of an inhabited dwelling house . . . or the inhabited portion of any other building, is burglary of the first degree." In the proceedings below, defendant focused on this statute and argued that his crime was not first degree burglary because the stairway was not an inhabited portion of the building. That argument misses the mark. The building here was indisputably an inhabited dwelling house. The question is whether defendant's conduct constituted a burglary of that building: whether his entry onto the stairway was an entry into the building.

[2]The Supreme Court has explained that burglary laws are based upon a recognition of the dangers created by the usual housebreaking situation—" 'the danger that the intruder will harm the occupants in attempting to perpetuate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence.' " (*People* v. *Gauze* (1975) 15 Cal.3d 709, 715 [125 Cal.Rptr. 773, 542 P.2d 1365], quoting from *People* v. *Lewis* (1969) 274 Cal.App.2d 912, 920 [79 Cal.Rptr. 650].) The *Nible* court relied upon this language and reasoned that "[t]he inhabitants of a building are just as likely to react violently to an intruder's penetration of their window screen as to the penetration of the window itself." (200 Cal.App.3d at p. 845.)

opening the gate violated the inhabitants' expectation that intruders would not penetrate the space without permission. (Cf. *People* v. *Brown* (1992) 6 Cal.App.4th 1489 [8 Cal.Rptr.2d 513] [occupant had no reasonable expectation of protection from intrusion onto an unenclosed front porch having no gate or other barrier against access from public sidewalk].)

The judgment is affirmed.

Strankman, P. J., and Stein, J., concurred.

A petition for a rehearing was denied June 22, 1994, and appellant's petition for review by the Supreme Court was denied August 11, 1994. Mosk, J., and Werdeger, J., were of the opinion that the petition should be granted.