[No. S058743. July 30, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL WAYNE DAVIS, Defendant and Appellant.

## COUNSEL

George O. Benton, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Catherine A. Rivlin and Gregg E. Zywicke, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—Defendant was convicted of forgery, receiving stolen property, and burglary, based upon evidence that he presented a stolen and forged check to the teller at a check-cashing business by placing the check in a chute in a walk-up window. Defendant maintains that the burglary conviction must be reversed because he did not enter the check-cashing facility. For the reasons that follow, we agree.

I

On May 27, 1995, defendant approached the walk-up window of a check-cashing business named the Cash Box and presented a check to the teller by placing the check in a chute in the window. The teller later described the chute as follows: "It has a handle, and it opens out like a flap. It opens out, and they put the check in. They pass the check through." The check was drawn on the account of Robert and Joan Tallman, whose names were imprinted on the check, and was payable in the amount of $274 to Mike Woody, a name defendant sometimes used. The check was signed with the name Robert Tallman.

The teller placed a small white oval sticker on the back of the check, passed the check back to defendant, and asked him to place his thumbprint on the sticker and endorse the check. Defendant placed his thumbprint on the sticker, signed the back of the check with the name Michael D. Woody, and passed the check back to the teller, using the chute.

The teller telephoned Robert Tallman, who denied having written the check. Tallman later discovered that a group of checks, including this one, had been stolen from his automobile. The teller placed Tallman on hold and telephoned the police. An officer arrived within minutes and arrested defendant, who still was waiting at the window. At the police station, the police directed defendant to give several examples of his handwriting by repeatedly signing the name "Robert Tallman."

At trial, Tallman testified that neither the signature nor any of the other writing on the check was his.

Defendant was convicted of forgery (Pen. Code, § 470),[1] burglary (§ 459), and receiving stolen property (§ 496, subd. (c)). Defendant waived his statutory right to a jury trial as to the truth of the prior prison term allegation, and after a brief hearing the trial court found true the allegation that defendant previously had been convicted of a felony for which he had served a prison term. (§ 667.5, subd. (b).) Defendant was sentenced on the forgery count to the upper term of three years in prison, plus an additional year for the prior prison term enhancement, for a total term of four years in prison. Defendant was sentenced on the burglary count to a concurrent term of three years in prison, and on the receiving stolen property count to a concurrent term of three years in prison. The Court of Appeal affirmed the judgment. We granted review to determine whether there was sufficient evidence to support the conviction for burglary.

## II

■ Under section 459, a person is guilty of burglary if he or she enters any building (or other listed structure) with the intent to commit larceny or any felony.[2] We must determine whether the Legislature intended the term "enter," as used in the burglary statute, to encompass passing a forged check through a chute in a walk-up window of a check-cashing or similar facility.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

[2] Section 459 states: "Every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, as defined in Section 21 of the Harbors and Navigation Code, floating home, as defined in subdivision (d) of Section 18075.55 of the Health and Safety Code, railroad car, locked or sealed cargo container, whether or not mounted on a vehicle, trailer coach, as defined in Section 635 of the Vehicle Code, any house car, as defined in Section 362 of the Vehicle Code, inhabited camper, as defined in Section 243 of the Vehicle Code, vehicle as defined by the Vehicle Code, when the doors are locked, aircraft as defined by Section 21012 of the Public Utilities Code, or mine or any underground portion thereof, with intent to commit grand or petit larceny or any felony is guilty of burglary."

Section 460, subdivision (a), defines first degree burglary as "burglary of an inhabited dwelling house, vessel, as defined in the Harbors and Navigation Code, which is inhabited and designed for habitation, floating home, as defined in subdivision (d) of Section 18075.55

The burglary statutes do not define the term "enter." In the present case, the Attorney General conceded at oral argument that no part of defendant's body entered the building, but it long has been established that a burglary also can be committed by using an instrument to enter a building.

In his Commentaries on the Laws of England, Sir William Blackstone stated regarding the elements of burglary: "As for the entry, any the least degree of it, with any part of the body, or with an instrument held in the hand, is sufficient; as to step over the threshold, to put a hand or a hook in at a window to draw out goods, or a pistol to demand one's money, are all of them burglarious entries." (4 Blackstone's Commentaries 227.) But the common law drew a puzzling distinction. An entry by instrument was sufficient for burglary only if the instrument was used to commit the target larceny or felony. Insertion of an instrument for the sole purpose of gaining entry to the building did not constitute burglary.

The common law drew no such distinction if any part of the defendant's body entered the building. As Rollin Perkins observes in his textbook on Criminal Law: "Where it is a part of the body itself, its insertion into the building is an entry, within the rules of burglary, whether the purpose was to complete the felonious design or merely to effect a breaking. Thus if the miscreant should open a window too small to admit his body, and should insert his hand through this opening merely for the purpose of unlocking a door, through which he intends to gain entrance to the building, he has already made an 'entry' even if he should get no farther. But where a tool or other instrument is intruded, without any part of the person being within the house, it is an entry if the insertion was for the purpose of completing the felony but not if it was merely to accomplish a breaking. If the instrument is inserted in such a manner that it is calculated not only to make a breach but also to accomplish the completion of the felonious design, this constitutes both a breach and an entry." (Perkins, Criminal Law (3d ed. 1982) pp. 253-254, fns. omitted.) An illustrative case cited by Perkins is *Walker* v. *State* (1879) 63 Ala. 49, in which the defendant bored a hole through the floor of a corn crib, caught the shelled corn in a sack as it flowed through the hole, then sealed the hole using a corn cob. The entry of the bit of the auger into the corn crib was held to be a sufficient entry for purposes of burglary, because the instrument was used both to effect entry and to accomplish the larceny.

Although many jurisdictions adhere to the rule that entry by means of an instrument is sufficient for burglary only if the instrument was used to

of the Health and Safety Code, or trailer coach, as defined by the Vehicle Code, or the inhabited portion of any other building." Subdivision (b) of section 460 provides: "All other kinds of burglary are of the second degree."

commit the intended larceny or felony (compare *State* v. *Ison* (Alaska Ct.App. 1987) 744 P.2d 416, 419, with *Hebron* v. *State* (1993) 331 Md. 219 [627 A.2d 1029, 1038]), the reason for this rule is not clear, and California courts have declined to adopt it.

In *People* v. *Walters* (1967) 249 Cal.App.2d 547 [57 Cal.Rptr. 484], the Court of Appeal purported to apply the rule that an entry by instrument must be for the purpose of committing the intended crime, but held nevertheless that a burglarious entry had occurred where the defendants were found on the roof of a market near a vent, the cover of which had been removed and through which a rope had been lowered into the restroom of the market. A grate on the restroom ceiling had been broken, and some tools were found lying on the broken grate, but there was nothing to suggest that these instruments were being used to accomplish the intended larceny. Nevertheless, the Court of Appeal held: "The presence of these items [in] the market's interior and the discovery of the instruments nearby sustain the inference that hands and tools manipulated by appellants effected an entry which constituted the crime of burglary." (*Id.* at p. 551.)

In *People* v. *Osegueda* (1984) 163 Cal.App.3d Supp. 25 [210 Cal.Rptr. 182], burglars were apprehended after they had succeeded in creating a small hole in the wall of an electronics store. It reasonably could be inferred that, in creating the hole in the wall, some portion of the tools had entered the building, but that the entry of these implements was not for the purpose of completing the intended larceny. The Appellate Department of the Los Angeles Superior Court found this was a sufficient entry for purposes of burglary: "We reject the decisions of out-of-state jurisdictions which differentiate between an entry by body and by instrument. We find no plausible reason for holding that an entry by instrument must be for the purpose of removing property. We find no California authority for contrary reasoning." (*Id.* at p. Supp. 31.)

The Court of Appeal followed *Osegueda* in *People* v. *Moore* (1994) 31 Cal.App.4th 489 [37 Cal.Rptr.2d 104] in holding there was sufficient entry for burglary where the defendant had attempted to pry open the front door of an apartment using a tire iron, and an occupant of the apartment had seen the tip of the tire iron protrude into the apartment.

■ We agree that a burglary may be committed by using an instrument to enter a building—whether that instrument is used solely to effect entry, or to accomplish the intended larceny or felony as well. Thus, using a tire iron to pry open a door, using a tool to create a hole in a store wall, or using an auger to bore a hole in a corn crib is a sufficient entry to support a

conviction of burglary. But it does not necessarily follow that the placement of a forged check in the chute of a walk-up window constitutes entering the building within the meaning of the burglary statute, although that conclusion would be compelled were we to follow the decision in *People* v. *Ravenscroft* (1988) 198 Cal.App.3d 639 [243 Cal.Rptr. 827], the only California authority to address an analogous question. As we shall explain, we do not find the reasoning in *Ravenscroft* persuasive.

The defendant in that case was convicted of two counts of burglary based upon his conduct of "surreptitiously stealing and inserting the automated teller machine (ATM) card of his traveling companion, Barbara Ann Lewis, in two ATM's and punching in her personal identification number, which he had previously noted, on the ATM keypads in order to withdraw funds from her account." (*People* v. *Ravenscroft, supra*, 198 Cal.App.3d 639, 641.) The Court of Appeal first concluded that an ATM is a structure protected by the burglary statute. The court then turned to the question whether insertion of the ATM card constituted an entry into that structure. The court rejected the defendant's arguments that insertion of the card did not violate the air space of the ATM, and that insertion of the card did not constitute an entry, because the defendant lost control of the card once it entered the ATM: "The insertion of an ATM card to effectuate larcenous intent is no less an entry into the air space of a bank as would be the use of any other tool or instrument. Although the California Penal Code does not define 'entry' for the purpose of burglary, the California courts have found that a burglary is complete upon the slightest partial entry of any kind, with the requisite intent, even if the intended larceny is neither committed nor even attempted. [Citations.] By pushing Lewis's card into an ATM's slot, the defendant completed the crime. Further control of the card is unnecessary." (*Id.* at p. 643.)

The Court of Appeal then rejected the defendant's further contention that he did not commit burglary by inserting the ATM card, because this act differed from other examples of entry by instrument: "Ravenscroft argues that *Walters* and *Osegueda, supra*, should not apply to this case since they involve more traditional violations of air space with more traditional burglars' tools. . . . [¶] . . . [¶] The fact that both *Walters* and *Osegueda* involve more traditional methods of burglary is of no moment. The gravamen of burglary is an act of entry, no matter how partial or slight it may be, with an instrument or tool which is appropriate for the particular instance, accompanied by the proper intent. [Citations.]" (*People* v. *Ravenscroft, supra*, 198 Cal.App.3d 639, 643-644.)

The appellate court in *Ravenscroft* properly rejected various arguments presented by the defendant, correctly concluding that the card was inserted

into the air space of the ATM, that the circumstance that the defendant lost control of the card is not dispositive, and that the rule governing entry by means of an instrument is not limited to traditional burglar tools.[3] Instruments other than traditional burglar tools certainly can be used to commit the offense of burglary. A laser could be used to cut an opening in a wall, a robot could be used to enter a building, or an ATM card could be used to "jimmy" a lock. But it does not necessarily follow from these conclusions that insertion of a stolen card into an ATM constitutes burglary.

The Court of Appeal in *Ravenscroft* appeared to reason that because an entry by means of an instrument is not limited to the use of traditional burglar's tools, there are no limitations within the meaning of the burglary statute on what constitutes entry by means of an instrument. It certainly is within the scope of the burglary statute to recognize that using a cutting tool to breach the walls, doors, or windows of a building constitutes an entry, whether the burglar uses traditional burglar tools or a laser, and that using an instrument to reach into a building and remove property constitutes burglary whether that instrument is a hook or a robot. These are the traditional types of entry prohibited by the burglary statute, even though the entry may be accomplished in new ways.

Inserting a stolen ATM card into the designated opening in an ATM is markedly different from the types of entry traditionally covered by the burglary statute, as is passing a forged check through a chute in a walk-up window. In each situation the defendant causes an object to enter the air space of a building, but it is not apparent that the burglary statute was meant to encompass such conduct. It is important to establish reasonable limits as to what constitutes an entry by means of an instrument for purposes of the burglary statute. Otherwise the scope of the burglary statute could be expanded to absurd proportions. For example, the Attorney General asserted at oral argument that mailing a forged check from New York to a bank in California, or sliding a ransom note under a door, would constitute burglary. A person who mails a forged check to a bank or slides a ransom note under a door causes that forged check or ransom note to enter the building, but it cannot reasonably be argued that these acts constitute burglary. Under the expansive approach to the burglary statute taken by the Attorney General and reflected in the *Ravenscroft* decision, it is difficult to imagine what

---

[3]In *People* v. *Montoya* (1994) 7 Cal.4th 1027, 1041-1042 [31 Cal.Rptr.2d 128, 874 P.2d 903], we cited the decision in *Ravenscroft*, along with numerous other decisions, in support of the general proposition that "[o]ne may be liable for burglary upon entry with the requisite intent to commit a felony or a theft (whether felony or misdemeanor), regardless of whether the felony or theft is different from that contemplated at the time of entry, or whether any felony or theft actually is committed." Our decision in *Montoya* had no occasion to consider the specific holding or analysis in *Ravenscroft* that is at issue in the present case.

reasonable limit would be placed upon the scope of the burglary statute. It could be argued similarly that a defendant who, for a fraudulent purpose, accesses a bank's computer from his or her home computer via a modem has electronically entered the bank building and committed burglary.

The crucial issue, not considered by the court in *Ravenscroft,* is whether insertion of the ATM card was the type of entry the burglary statute was intended to prevent. In answering this question, we look to the interest sought to be protected by the burglary statute in general, and the requirement of an entry in particular.

The interest sought to be protected by the common law crime of burglary was clear. At common law, burglary was the breaking and entering of a dwelling in the nighttime. The law was intended to protect the sanctity of a person's home during the night hours when the resident was most vulnerable. As one commentator observed: "The predominant factor underlying common law burglary was the desire to protect the security of the home, and the person within his home. Burglary was not an offense against property, real or personal, but an offense against the habitation, for it could only be committed against the dwelling of another. . . . The dwelling was sacred, but a duty was imposed on the owner to protect himself as well as looking to the law for protection. The intruder had to break and enter; if the owner left the door open, his carelessness would allow the intruder to go unpunished. The offense had to occur at night; in the daytime home-owners were not asleep, and could detect the intruder and protect their homes." (Note, *Statutory Burglary—The Magic of Four Walls and a Roof* (1951) 100 U. Pa. L.Rev. 411, 427, fns. omitted.) The drafters of the Model Penal Code observed: "The notable severity of burglary penalties is accounted for by the fact that the offense was originally confined to violent nighttime assault on a dwelling. The dwelling was and remains each man's castle, the final refuge from which he need not flee even if the alternative is to take the life of an assailant. It is the place of security for his family, as well as his most cherished possessions. Thus it is perhaps understandable that the offense should have been a capital felony at common law . . . ." (Model Pen. Code & Commentaries, com. to § 221.1, p. 67.)[4]

In California, as in other states, the scope of the burglary law has been greatly expanded. There is no requirement of a breaking; an entry alone is

---

[4]Blackstone's Commentaries states that burglary "has always been looked upon as a very heinous offense; not only because of the abundant terror that it naturally carries with it, but also as it is a forcible invasion and disturbance of that right of habitation, which every individual might acquire even in a state of nature; an invasion, which in such a state would be sure to be punished with death, unless the assailant were the stronger. But in civil society the laws also come in to the assistance of the weaker party; and, besides that they leave him this natural right of killing the aggressor, if he can . . . , they also protect and avenge him, in case the might of the assailant is too powerful. And the law of England has so particular and tender

sufficient. The crime is not limited to dwellings, but includes entry into a wide variety of structures. The crime need not be committed at night. "Of all common law crimes, burglary today perhaps least resembles the prototype from which it sprang. In ancient times it was a crime of the most precise definition, under which only certain restricted acts were criminal; today it has become one of the most generalized forms of crime, developed by judicial accretion and legislative revision. Most strikingly it is a creature of modern Anglo-American law only. The rationale of common law burglary, and of house-breaking provisions in foreign codes, is insufficient to explain it." (Note, *Statutory Burglary—The Magic of Four Walls and a Roof, supra,* 100 U. Pa. L.Rev. at p. 411.)

More than a century ago, in *People* v. *Barry* (1892) 94 Cal. 481 [29 P. 1026], this court addressed the subject of what constitutes an entry for purposes of burglary. The defendant in *Barry* entered a grocery store during business hours and attempted to commit larceny. This court, rejecting the contention that a burglary had not occurred because the defendant had entered lawfully as part of the public invited to enter the store, stated: "[A] party who enters with the intention to commit a felony enters without an invitation. He is not one of the public invited, nor is he entitled to enter." (*Id.* at p. 483; *People* v. *Salemme* (1992) 2 Cal.App.4th 775, 781 [3 Cal.Rptr.2d 398] [entering a residence to sell fraudulent securities is an entry within the meaning of the burglary statute].)

In *People* v. *Gauze* (1975) 15 Cal.3d 709 [125 Cal.Rptr. 773, 542 P.2d 1365], we clarified our holding in *Barry* and held that a person cannot burglarize his or her own home. ▇ We observed that "[a] burglary remains an entry which invades a possessory right in a building." (*Id.* at p. 714.) We then discussed the interest protected by the burglary statute: " 'Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence. The laws are primarily designed, then, not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety.' Section 459, in short, is aimed at the danger caused by the unauthorized entry itself." (*Id.* at p. 715.)

We repeated that sentiment in *People* v. *Montoya, supra,* 7 Cal.4th 1027, 1045, in which we held that, "for the purpose of assessing the liability of an

a regard to the immunity of a man's house, that it styles it his castle, and will never suffer it to be violated with impunity . . . ." (4 Blackstone's Commentaries 223.)

aider and abettor, a burglary is considered ongoing during the time the perpetrator remains inside the structure." We stated: "The crime of burglary consists of an act—unlawful entry—accompanied by the 'intent to commit grand or petit larceny or any felony.' " (*Id.* at p. 1041, fn. omitted.) We noted that the "underlying basis for the criminal sanction" of burglary is " 'the danger caused by the unauthorized entry itself.' " (*Id.* at p. 1042.) The Model Penal Code echoes this theme by noting that the crime of burglary "reflects a considered judgment that especially severe sanctions are appropriate for criminal invasion of premises under circumstances likely to terrorize occupants." (Model Pen. Code & Commentaries, Introductory Note to art. 221, p. 59.)

 ■ Inserting a stolen ATM card into an ATM, or placing a forged check in a chute in the window of a check-cashing facility, is not using an instrument to effect an entry within the meaning of the burglary statute. Neither act violates the occupant's possessory interest in the building as does using a tool to reach into a building and remove property. It is true that the intended result in each instance is larceny. But the use of a tool to enter a building, whether as a prelude to a physical entry or to remove property or commit a felony, breaches the occupant's possessory interest in the building. Inserting an ATM card or presenting a forged check does not. Such acts are no different, for purposes of the burglary statute, from mailing a forged check to a bank or check-cashing facility.[5]

By analogy, a person who returns books to a library by depositing them in a book drop, causing the books to slide down a chute into the library, has not

---

[5] We disapprove the decision in *People* v. *Ravenscroft, supra,* 198 Cal.App.3d 639, to the extent it is inconsistent with our holding. We do not disapprove the other aspects of the decision in *Ravenscroft,* including its conclusion that the ATM card in that case was inserted into the air space of the ATM. (*Ante,* at pp. 718-719; see *People* v. *Nible* (1988) 200 Cal.App.3d 838, 843-844 [247 Cal.Rptr. 396].)

In reaching its conclusion in *Ravenscroft,* the Court of Appeal relied upon a federal court decision, *United States* v. *Goudy* (7th Cir. 1986) 792 F.2d 664, that affirmed a conviction under a federal criminal statute prohibiting entering a bank with the intent to commit a felony. (18 U.S.C. § 2113(a).) Although the decision in *Goudy* indicates that the defendant committed the crime at the walk-up window of a drive-up facility of a bank, the opinion does not include a description of the drive-up facility or its walk-up window and does not explain specifically the manner in which the defendant used that facility. Thus, it is unclear whether *Goudy* involved the insertion of a portion of the defendant's body into the air space of the bank or the use of an instrument.

The decision in *United States* v. *Goudy, supra,* 792 F.2d 664, cited and relied upon two other federal decisions involving the application of 18 United States Code section 2113(a), *United States* v. *Lankford* (8th Cir. 1978) 573 F.2d 1051 and *United States* v. *Phillips* (8th Cir. 1979) 609 F.2d 1271. Each of the cited decisions appears to have involved either an entry, or attempted entry, of a portion of the defendant's body into a night depository chute or drive-up teller mechanism. Neither decision specifically considered the issue whether the insertion of a forged check or comparable item into a walk-up window constitutes an entry for purposes of the offense of burglary.

entered the library. It would be unreasonable to characterize the books as "instruments" used to enter the library. But if a person reaches his or her hand into the book drop, or uses a tool, in an attempt to steal books, such an act would constitute burglary.[6]

Our conclusion that the limits of the burglary statute should not be stretched beyond recognition does not leave the public without reasonable protection from criminal conduct, for the Legislature has enacted a variety of penal statutes that apply to the criminal activity involved in cases such as *Ravenscroft* or the present case. The use of an ATM card with intent to defraud, for example, specifically is penalized by section 484g and the Legislature, of course, could enact a similar statute pertaining to check-cashing facilities. Unauthorized entry into a computer system is addressed by sections 502 and 502.01. And in the present case, our reversal of defendant's conviction of burglary does not affect his convictions for forgery and receiving stolen property, or his resulting sentence of four years in prison.[7]

---

[6]The record in the present case does not disclose whether, or to what extent, defendant reached into the chute of the walk-up window as he passed the check into the facility. As noted above, the Attorney General conceded at oral argument that no part of defendant's body entered the check-cashing facility. We need not, and therefore do not, consider whether a slight entry of a portion of defendant's body into the chute of the walk-up window would be a sufficient entry under the statute defining the offense of burglary.

[7]The dissent argues that defendant entered the building by passing the forged check through the chute in the window, but attempts to limit the effects of its proposed holding by creating a new rule: "[N]o burglar at the crime scene, no burglary." (Dis. opn., *post*, at p. 727.) The dissent does not explain the genesis of its proposed new rule and does not explore its consequences. Under the dissent's proposed rule, a person who used a remote-controlled robot, operated from across the street or across town, to enter a building for the purpose of committing larceny or any felony would not commit burglary, even though such an entry by instrument is simply a modern version of the type of entry the burglary statute was designed to punish.

The dissent suggests that our opinion will "cast doubt" on the decision in *People* v. *Salemme, supra,* 2 Cal.App.4th 775, which affirmed a conviction for burglary where the defendant entered the victim's apartment to sell fraudulent securities. (Dis. opn., *post*, at p. 736.) Unlike the present case, the defendant in *Salemme* physically entered the apartment but argued, without success, that his "entry did not constitute burglary because the act posed no physical danger to the victim who had invited defendant in to negotiate the sale of securities." (2 Cal.App.4th at p. 781.) In the present case, defendant does not argue that he was invited to pass the forged check through the chute. Rather, defendant denies that he entered the check-cashing facility. Nothing in the present opinion affects the validity of the decision in *Salemme.*

Finally, the dissent asserts that our decision will produce anomalous results, because a person who inserts a stolen ATM card into an ATM affixed to an exterior wall of a bank does not commit burglary, but a person who enters the lobby of a bank to perform the same act does commit burglary. (Dis. opn., *post*, at pp. 736-737.) There is no anomaly in the circumstance that one who attempts a crime outside a building does not commit burglary, while another person who enters a building in order to attempt the same crime does commit

For the reasons discussed above, we conclude that defendant's placement of a forged check in the chute of the walk-up window of the check-cashing facility at issue cannot reasonably be termed an entry into the building for purposes of the burglary statute. Accordingly, the judgment of the Court of Appeal is reversed to the extent it affirms defendant's conviction for burglary, and affirmed in all other respects.

Mosk, J., Kennard, J., and Werdegar, J., concurred.

**BAXTER, J.**—I respectfully dissent. Defendant's act of passing a forged check through the walk-up security window of the check-cashing facility met the statutory and common law requirement of an "entry" sufficient to sustain his conviction of burglary. Defendant used the forged check as an instrumentality to trick the teller into handing him money back through a chute designed to protect this very type of particularly vulnerable business—a check-cashing facility—and its employee-occupants, from persons with criminal designs such as his. Defendant's use of the forged check served both to *breach* the security system of the business, by tricking the teller into taking the check from him through the security chute, and to gain *entry* into the premises, insofar as the check was literally used as a paper "hook" to enter the air space of the check-cashing facility and effectuate theft of cash on the spot from the business. Such was no less an act of larceny, and no less a breach of the business owner's "possessory interest" in his business premises accomplished through a burglarious entry, than if defendant had reached through an open window or entered through an unlocked door and grabbed his loot.

The majority suggest that conviction of burglary on these facts would unduly expand the scope of the burglary statutes to "absurd proportions." (Maj. opn., *ante*, at p. 719.) To the contrary, the majority's holding is patently at odds with the approach courts have been taking since the crime of burglary was codified over a century ago—that of moving the law in a direction away from the inflexible restraints that characterized burglary at early common law, and instead adapting the crime, within the confines of its legislative codification, to meet the security needs of a growing, changing, and increasingly crime-ridden modern society.

The majority expressly disapprove *People* v. *Ravenscroft* (1988) 198 Cal.App.3d 639 [243 Cal.Rptr. 827], a decision at odds with their analysis. As will be explained, the majority do more than merely disapprove a single decision, for the majority's opinion casts doubt on a well-settled line of

burglary. Burglary is defined as an entry into a specified structure with the intent to commit larceny or any felony. Under the statute, if there is no entry, no burglary has occurred.

authority that dutifully follows this court's teaching in *People* v. *Gauze* (1975) 15 Cal.3d 709 [125 Cal.Rptr. 773, 542 P.2d 1365] that "burglary remains an entry which invades a *possessory right* in a building" (*Id.* at p. 714, italics added.) Under settled authorities, the possessory rights of the owners and employees of the check-cashing facility victimized in this case included the right to conduct lawful business through the air space of their security chute; the related right to extend a conditional invitation to only those persons intending to conduct lawful business by inviting such patrons to tender legally valid checks to the teller through the security chute; and the basic right to structure their business operations in a manner that discourages thefts and robberies and protects them from such criminal conduct, namely, through use of a walk-up window and security chute. Defendant's passing of the forged check through the air space of the security chute into the check-cashing facility in an attempt to trick the teller into handing money out to him on the spot violated each of these aspects of the business owners' possessory rights in the business premises.

The majority refuse to recognize as much, and instead effectively redefine the concept of a *possessory right* in premises for purposes of determining whether an entry by tool or instrument constitutes a burglarious entry. The majority seemingly endorse some new test for establishing an unlawful entry by tool or instrument, but it is a nebulous standard that even the majority have difficulty characterizing in concrete terms. The majority first concede, as they must, for the authorities are settled, that "a burglary may be committed by using an instrument to enter a building—whether that instrument is used solely to effect entry, or to accomplish the intended larceny or felony as well." (Maj. opn., *ante*, at p. 717.) But the majority then go on to require that such an unlawful entry by instrument be one that "it is . . . apparent . . . the burglary statute was meant to encompass . . . ." (*Id.* at p. 719.) Exactly how trial courts are to determine this is not clear from the majority's analysis. The trial courts are admonished that "[i]t is important to establish reasonable limits as to what constitutes an entry by means of an instrument for purposes of the burglary statute. Otherwise the scope of the burglary statute could be expanded to absurd proportions." (*Ibid.*) They are also cautioned that "the limits of the burglary statute should not be stretched beyond recognition" (*id.* at p. 723). A number of farfetched hypotheticals are posed (e.g., maj. opn., *ante*, at p. 722) which, under any test, would never constitute burglary. Under the majority's analysis one is ultimately left wondering why defendant's placement of the forged check through the security chute, the functional equivalent of use of a tool or instrument as an extension of the burglar's arm and hand both to *breach* the secured premises and effectuate an *entry* into its air space even under the early common law cases, and an act plainly done with felonious intent, nonetheless does not constitute a burglarious entry.

Whatever be the majority's new test, it sets forth requirements heretofore uncalled for under the present day statutory and prevailing common law definitions of burglary. Confusion in our trial courts will be the result.

I

On appeal defendant contended there was insufficient evidence to sustain his conviction of burglary because evidence that he passed a forged check through the walk-up window or security chute of the check-cashing facility could not establish the element of "entry." The Court of Appeal disagreed.

Since 1892, the courts of this state have recognized that the codification of burglary in Penal Code section 459 (hereafter section 459) shares few elements with the early common law crime of burglary. (*People* v. *Salemme* (1992) 2 Cal.App.4th 775, 779 [3 Cal.Rptr.2d 398], citing *People* v. *Barry* (1892) 94 Cal. 481, 482-484 [29 P. 1026].) Presently, any person who "enters any . . . building, . . . with intent to commit . . . larceny or any felony is guilty of burglary." (§ 459.) And "[i]t is well settled that an entry occurs for purposes of the burglary statute if any part of the intruder's body, or a tool or instrument wielded by the intruder, is 'inside the premises.'" (*People* v. *Wise* (1994) 25 Cal.App.4th 339, 345 [30 Cal.Rptr.2d 413]; see also *People* v. *Failla* (1966) 64 Cal.2d 560, 569 [51 Cal.Rptr. 103, 414 P.2d 39]; *People* v. *Moore* (1994) 31 Cal.App.4th 489, 491 [37 Cal.Rptr.2d 104].)

Under a straightforward application of the law to the facts of this case, defendant stood at the walk-up window and handed or passed a forged check through the security chute into the check-cashing facility with the intent to steal money from the business. His larcenous intent was a felonious intent. Forgery is also a felony. (Pen. Code, §§ 473, 17.) To the extent defendant passed the check through the chute to perfect and realize gains from his act of forgery, either felonious intent (larceny or forgery) would serve to establish the requisite unlawful specific intent for burglary.

As regards the element of "entry," in this case we are concerned specifically with an entry by "tool or instrument wielded by the [defendant]" (*People* v. *Wise, supra,* 25 Cal.App.4th at p. 345)—to wit, the forged check. When defendant gave the forged check to the teller through the security chute, at the very least, the paper document he "wielded" in his hand crossed through the outer boundary of the business premises as it was received by the teller.[1] Respondent's misleading and imprudent suggestion at oral argument that mailing a forged check from New York to a bank in California

---

[1] The majority emphasize respondent's "concession" at oral argument "that no part of defendant's body entered the building" in this case. (Maj. opn., *ante*, at p. 716.) I question the

would likewise constitute burglary (see maj. opn., *ante*, at p. 719)—and the majority's own hypothetically stated concern that a defendant "who, for a fraudulent purpose, accesses a bank's computer from his or her home computer via a modem [and] has [thereby] electronically entered the bank building" should not be subject to prosecution for burglary (*id.* at p. 720)— are red herrings. In neither hypothetical has a tool or instrument been wielded by a burglar to serve as an extension of his hand, arm, or body for the purpose of gaining entry into the premsies. Simply put: no burglar at the crime scene, no burglary.

The crux of the matter is simply this: Can the forged check validly be deemed a "tool or instrument" wielded by defendant and placed or passed through the outer boundary of the business premises (the security chute) for the felonious purpose of burglarizing the establishment?

The majority start out by correctly observing that "the [early] common law drew a puzzling distinction. An entry by instrument was sufficient for burglary only if the instrument was used to commit the target larceny or

propriety of accepting such a factual "concession." Admittedly, the description in the record of the secured window or chute is somewhat vague. However, based on the trial testimony, the jury could have concluded beyond a reasonable doubt that defendant put his hand in the chute. Even if he did not do so when he put the check in the chute the first time, he probably put at least a finger in it when the teller passed the check back to him for signature and thumbprinting and he took it out of the chute.

Whatever be respondent's motive for relying solely on defendant's insertion of the forged check through the chute to support the element of "entry" necessary for defendant's conviction of burglary in this case, the determinative facts are those established in the record on appeal, and we are bound to review the facts as found by the Court of Appeal on that record unless successfully challenged on rehearing before that court. (Cal. Rules of Court, rule 29(b)(2).) The Court of Appeal in this case expressly found that, "[defendant's] suggestion that there is some factual basis for concluding that it was the clerk, not [defendant], who passed the check through the window is not supported by the record." In a footnote to that finding the Court of Appeal added, "In fact, [defendant's] trial counsel all but conceded that the evidence established the element of entry, and instead focused only on the question whether he had any felonious intent." The Court of Appeal explained, "The clerk testified that the walk-up window had, 'like a shoot [*sic*]. It has a handle, and it opens out like a flap. It opens out, and they put the check in. They pass the check through.'" The court also noted, "The clerk further testified that he immediately stamped the check, and then [defendant] signed it, and placed his thumbprint on it. This testimony suggests that the clerk passed the check back to [defendant] who signed it, applied his thumbprint, and then passed it through the flap, a second time."

On this factual record, and given defendant's concessions below, respondent's position at oral argument before this court, that only the check and no portion of defendant's hand passed through the chute, is somewhat puzzling. In any case, the check was placed in the chute by defendant and, as such, it became an extension of his hand or body—i.e., the legal equivalent of a tool or a hook had he sought to use such an instrument to remove money through an open window. As will be explained (*post*, at p. 727), it has never been of legal consequence in California that such an instrument be used for the purpose of breaking into or gaining entry into the burglarized premises, as opposed to its use to commit the target larceny or felony.

felony. Insertion of an instrument for the sole purpose of gaining entry to the building did not constitute burglary." (Maj. opn., *ante*, at p. 716.) In other words, under the early common law, a burglary would have been complete upon the insertion of a hook through a window for the purpose of snagging and pulling out valuables from the burglarized structure. But if the burglary suspect used a crowbar to break through a window or door and then fled before any portion of his body had entered the structure, the insertion of the crowbar into the air space of the building or structure was insufficient to establish a burglarious entry.

The majority further acknowledge, as they must, that unlike several out-of-state jurisdictions, California courts have declined to draw any distinction between the nature or purpose of the "tool or instrument" wielded by the burglar and used to enter the burglarized structure. (Maj. opn., *ante,* at pp. 716-717.)

In short, it is of no legal consequence in this case that the forged check defendant "wielded" and passed through the check-cashing facility's security chute was not used by him to *forcibly* break or gain entry into the business premises.

In contrast, it is of legal significance to note that defendant used the forged check *both* as a tool or instrument to breach the secured premises of the check-cashing facility (i.e., trick the teller into taking it from him through the air space of the security chute through which all of the business's transactions were conducted), *and* as the means for effectuating his felonious intent to steal (i.e., further trick the teller into cashing the forged check and passing money back out to him through the chute). As Rollin Perkins observes in his textbook on Criminal Law: "If the instrument is inserted in such a manner that it is calculated not only to make a breach but also to accomplish the completion of the felonious design, this constitutes both a breach and an entry." (Perkins, Criminal Law (3d ed. 1982) p. 254, fn. omitted.) Although either purpose would alone suffice to establish a burglarious entry under California law, here, use of the forged check to gain access into the business premises through the security chute *and* to steal money from the teller within satisfied both. In short, the forged check in this instance served both as a crowbar and a paper "hook."

## II

The most commonly recognized test for determining whether an entry sufficient to establish a burglary has occurred is to ascertain whether the defendant, or any tool or instrument wielded by the defendant, has crossed

the outer boundary of the "air space" of the structure or premises. (*People* v. *Ravenscroft, supra,* 198 Cal.App.3d 639, 643 (*Ravenscroft*).)

In *Ravenscroft*, the court concluded that the insertion of an automatic teller card into an automated teller machine (ATM) installed on the exterior wall of a bank constituted an "entry" within the meaning of section 459. The *Ravenscroft* court reasoned that "[t]he insertion of an ATM card to effectuate larcenous intent is no less an entry into the air space of a bank as would be the use of any other tool or instrument. . . . [¶] . . . [¶] . . . The gravamen of burglary is an act of entry, no matter how partial or slight it may be, with an instrument or tool which is appropriate for the particular instance, accompanied by the proper intent. . . . The insertion of a fraudulently obtained ATM card effectuates an entry into a bank's ATM for larceny just as surely as does a crowbar when applied to a vent." (198 Cal.App.3d at pp. 643-644; see also *People* v. *Moore, supra,* 31 Cal.App.4th at pp. 491-492.)

Although not discernible from the majority opinion, a decision directly relevant to the question at issue in this case was handed down the same year as *Ravenscroft*—*People* v. *Nible* (1988) 200 Cal.App.3d 838 [247 Cal.Rptr. 396] (*Nible*). Some discussion of *Nible* is pertinent here because, as the Court of Appeal recognized, *Nible* expressly purported to reject the bright line air space test handed down that same year in *Ravenscroft*. (200 Cal.App.3d at p. 844.) A close reading of *Nible*, however, reveals that the court did not actually reject *Ravenscroft*'s air space test outright, but instead sought to fashion a rule to address the specific facts and legal question before it, namely, how to determine the *outer boundaries* of a structure's air space for purposes of establishing a burglarious entry. The Court of Appeal in this case recognized that both the facts and rationale of *Nible* are distinguishable from the facts and legal question posed here and refused to apply *Nible*'s test, instead finding *Ravenscroft* controlling. Our majority, in contrast, without any mention of *Nible*'s analysis, instead purport to adopt some new test for establishing a burglarious entry by tool or instrument for all cases—a test one cannot help but conclude bears a strong resemblance to that announced in *Nible* for determining the outer physical boundaries of a burglarized structure. Although the majority claim not to be overruling the *Ravenscroft* air space test for purposes of determining whether an entry by tool or instrument is a burglarious entry (maj. opn., *ante*, at p. 722, fn. 5), they have effectively done just that.

In *Nible*, a woman asleep in her apartment heard a disturbance, investigated, and caught a burglar in the act of removing the screen of an open window of the residence. She slammed the window shut and called her husband, who in turn summoned the police. (*Nible, supra,* 200 Cal.App.3d at

■■■■■■■■■■■■■

p. 842.) "There was no evidence defendant touched [the victim's] window or crossed the boundary formed by the window into [her] bedroom." (*Id.* at p. 843.) The defendant fled but was quickly apprehended and charged with burglary. Both at trial and on appeal he urged the window was the outer boundary of the apartment, and that he had thus not effectuated a burglarious entry. The trial court instructed the jury they could find an entry if a part of defendant's body or a tool or instrument used by him had penetrated " '. . . the area inside where the screen was normally affixed in the window frame in question.' " (*Ibid.*, fn. omitted.) The Court of Appeal found the instruction proper and affirmed.

The *Nible* court stated the precise issue before it as follows: "No California authority has considered whether the penetration of a window screen, without penetration of the plane formed by the window beyond, constitutes an entry within the meaning of section 459." (*Nible, supra,* 200 Cal.App.3d at p. 843.) The defendant in *Nible* actually sought to *invoke* the air space test of *Ravenscroft*, arguing the window, and not the screen, marked the outer boundary of the air space of the victim's apartment. (200 Cal.App.3d at p. 843.) The *Nible* court initially agreed that *Ravenscroft*'s air space test was applicable but concluded it was of no avail to defendant because "it is reasonable to conclude that a window screen contains the outer boundary of a building's air space, especially when, as here, the window was left open." (200 Cal.App.3d at p. 844, fn. omitted.)

Unfortunately, the *Nible* court then continued: "However it might be applied here, in our view the 'air space' test, although useful in some situations, *is inadequate as a comprehensive test for determining when a burglarious entry occurs*." (*Nible, supra,* 200 Cal.App.3d at p. 844, italics added.) As a result of that statement, the *Nible* court's ensuing analysis could be mistakenly understood, not merely as a test for determining the outer physical boundary of a burglarized structure's air space, which was the precise factual question before that court, but as a test for redefining the broader concept of what constitutes a burglarious entry generally in all cases. The Court of Appeal in this case astutely recognized this nuance, limited *Nible*'s analysis to its facts, found the air space test of *Ravenscroft* the commonly approved test and the one applicable here for establishing the element of burglarious entry, and further recognized *Ravenscroft* remains good law even though the *Nible* court had gone beyond its own facts in unnecessarily questioning *Ravenscroft*'s rationale.

Given this background, the *Nible* court's analysis must be read, and its holding understood, in light of the facts and limited legal question before that court. *Nible* states that, "the ultimate test of whether a burglarious entry

has occurred must focus on the protection the owners or inhabitants of a structure reasonably expect." (*Nible, supra,* 200 Cal.App.3d at p. 844.) Under this test, "[t]he proper question is whether the nature of a structure's composition is such that a reasonable person would expect some protection from unauthorized intrusions." (*Ibid.*) The *Nible* court concluded that the penetration of an outer window screen constituted an "entry" under this test because " 'the screen door [or window] is a part of the house on which the occupants rely for protection and [the penetration of the screen] is a violation of the security of the dwelling house which is the peculiar gravamen of a burglarious breaking.' " (*Id.* at p. 845, quoting 13 Am.Jur.2d, Burglary, § 19, p. 331.)

The Court of Appeal in this case, in discussing and contrasting the holding of *Nible* with the general air space test formulated in *Ravenscroft*, correctly questioned the applicability of *Nible*'s holding "except in cases where the boundaries of the building's air space are difficult to determine." The Court of Appeal went on to conclude that even under the *Nible* test, defendant's actions here constituted a burglarious "entry" because "protection of the cashier is precisely the reason why the structure has a walk-up window and chute, rather than a door, or open window. Although it is expected and authorized to use the chute to pass checks to the cashier, [defendant] passed the check through with felonious intent unknown and unendorsed by the occupants."

I agree with the conclusion of the Court of Appeal that defendant's act of passing the forged check through the security chute plainly established the requisite entry for burglary under the applicable air space test of *Ravenscroft*. As the Court of Appeal aptly observed, "[t]he insertion of a forged check through the chute of a walk-up window is at least as intrusive as inserting an ATM card into a machine." Obviously, the check-cashing facility is a commercial establishment that extends only a conditional invitation to its patrons to transact lawful business through its security chute—i.e., the tendering of valid checks to the teller through the chute for cashing. The facility clearly does not extend an invitation to persons like defendant to pass forged checks through its security chute in an attempt to gain possession of, and thereby steal cash from, the business.

If we truly had occasion to apply *Nible*'s rationale and holding here—i.e., if defendant was questioning whether the air space of the chute was part and parcel of the air space of the check cashing facility premises generally—then it would have to be concluded that the air space of the check-cashing facility *includes* the air space within its security chute, through which it transacts all of its business with patrons who are not invited or permitted to physically

enter the business's premises. In short, defendant's burglary conviction on these facts squares with the holding in *Nible*. Nor do I understand defendant to even be arguing that the air space within the security chute is not part of the air space of the check cashing facility, generally speaking. Instead, defendant is seemingly urging that the passing of the forged check into the air space of the chute for some other reason was not the equivalent of the use of a tool or instrument, as an extension of his arm or body, to gain access through the outer boundary of the business premises and effectuate a burglarious entry. Defendant is unable to articulate a convincing basis for this position. The majority fare no better.

### III

Although it is unclear exactly what aspect of the *Ravenscroft* analysis and its bright line air space test the majority today disapprove (see maj. opn., *ante*, at p. 722, fn. 5), in its stead the majority appear to adopt a test strikingly similar to that announced in *Nible, supra,* 200 Cal.App.3d 838, a test expressly discussed and found inapplicable to the facts of this case by the Court of Appeal below.

Once again, for purposes of the precise issue before the *Nible* court—how to define the outermost boundary of a burglarized structure—that court suggested that "the ultimate test of whether a burglarious entry has occurred must focus on the protection the owners or inhabitants reasonably expect." (*Nible, supra,* 200 Cal.App.3d at p. 844.)

The majority here, in the paragraphs of their opinion immediately preceding the statement of their purported holding (see maj. opn., *ante*, at pp. 721-722), discuss this court's decisions in *People* v. *Gauze, supra,* 15 Cal.3d 709, and *People* v. *Montoya* (1994) 7 Cal.4th 1027 [31 Cal.Rptr.2d 128, 874 P.2d 903], two cases that dealt specifically with facts exemplifying " 'the dangers to personal safety created by the usual burglary situation' " (*Gauze, supra,* 15 Cal.3d at p. 715) and the notion that the "underlying basis for the criminal sanction" of burglary is " 'the danger caused by the unauthorized entry itself.' " (*Montoya, supra,* 7 Cal.4th at p. 1042.)

In this same vein, the distinguishing factor between the *Ravenscroft* air space test and the *Nible* test appears to be *Nible*'s consideration of the potential danger to the burglarized structure's occupants in determining whether a burglarious entry has occurred. While *Nible* focused on the burglary statute's purpose of "protect[ing] against unauthorized entry and attendant dangers," the court in *Ravenscroft* did not consider whether the entry must be of a sort that increases the danger to the occupants of the

structure. (*Nible, supra,* 200 Cal.App.3d at p. 844; *Ravenscroft, supra,* 198 Cal.App.3d at pp. 644-645.)

Whereas the *Nible* court should have limited its language to the appropriate test for defining the outermost physical boundaries of a burglarized structure's air space, *Ravenscroft* and this case present a much different and broader question—whether a person who, with larcenous or other felonious intent, passes an ATM card or a forged check through the air space of a business's security zone, i.e., the ATM's card slot in *Ravenscroft,* and the security chute in the instant case—thereby commits a burglarious entry within the meaning of section 459 and the relevant interpretative case law and authorities.

As the rationale for their "test" or holding, the majority state the following: "Inserting a stolen ATM card into an ATM, or placing a forged check in a chute in the window of a check-cashing facility, is not using an instrument to effect an entry within the meaning of the burglary statute. *Neither act violates the occupant's possessory interest in the building* as does using a tool to reach into a building and remove property. It is true that the intended result in each instance is larceny. But the use of a tool to enter a building, whether as a prelude to a physical entry or to remove property or commit a felony, breaches the occupant's possessory interest in the building. Inserting an ATM card or presenting a forged check does not. Such acts are no different, for purposes of the burglary statute, than mailing a forged check to a bank or check-cashing facility." (Maj. opn., *ante,* at p. 722, italics added, fn. omitted.)

This holding essentially redefines the element of entry by tool or instrument by recasting the notion of the occupant's *possessory right* in the burglarized premises for purposes of defining a burglarious entry. It thereby constitutes a marked and unwarranted departure from the commonly understood definition of a burglarious entry, one that will create confusion and lead to anomalous results.

California courts have long appreciated that the modern crime of burglary codified in section 459 has little in common with the rigid requirements for conviction of the offense at common law. (See, e.g., *People* v. *Salemme, supra,* 2 Cal.App.4th at p. 779 (*Salemme*).) Today, innumerable structures other than a dwelling or residence can be burglarized, the crime of burglary can be committed in the day or night, and it matters not whether the burglarized premises are occupied or unoccupied. Even an entry into a home or business with consent or permission may constitute burglary where the invitation to enter is given without knowledge of the defendant's felonious

intent. Nor is it necessary that the entry actually pose any physical danger to the occupants. (*Salemme, supra,* 2 Cal.App.4th at pp. 781-782.)

In distinguishing the rationale and holding of *Nible*, and instead following the bright line air space test of *Ravenscroft*, the Court of Appeal below placed reliance on the decision in *Salemme, supra,* 2 Cal.App.4th 775. I too find the rationale of *Salemme* instructive and particularly relevant here.

In *Salemme*, the defendant twice entered the victim's home with the intent to sell him fraudulent securities, ultimately making the sales. He was charged and convicted of two counts of burglary. (2 Cal.App.4th at p. 778.) The *Salemme* court affirmed the convictions. The court first explained: "[S]ince burglary is a breach of the occupant's possessory rights, a person who enters a structure enumerated in section 459 with the intent to commit a felony is guilty of burglary *except* when he or she (1) has an unconditional possessory right to enter as the occupant of that structure" (2 Cal.App.4th at p. 781; see *People* v. *Gauze, supra,* 15 Cal.3d 709) "or (2) is invited in by the occupant who knows of and endorses the felonious intent" (2 Cal.App.4th at p. 781; see *People* v. *Superior Court* (*Granillo*) (1988) 205 Cal.App.3d 1478 [253 Cal.Rptr. 316]). After observing that neither of these two exceptions to breach of the possessory right constituting burglary applied on the facts before it, the *Salemme* court went on to reject the defendant's argument that his entry into the victim's home did not constitute burglary because it posed no physical danger to the victim who had invited the defendant into the home. The court explained:

"It is true that dicta in *Gauze* and *Granillo* indicate one of the purposes of California's burglary laws is to protect against the dangers to personal safety created by the 'usual burglary situation.' (*Gauze, supra,* 15 Cal.3d at p. 715; *Granillo, supra,* 205 Cal.App.3d at p. 1485.) However, as noted above, the primary purpose is to protect a possessory right in property. Thus, *if there is an invasion of the occupant's possessory rights, the entry constitutes burglary regardless of whether actual or potential danger exists.*

"For example, the shoplifter who surreptitiously enters a store with the intent to steal commits burglary even though his or her clandestine effort to slip merchandise into a jacket does not necessarily threaten anyone's personal safety. Defendant has not distinguished the shoplifting scenario from this case and, in our view, there is no logical way to do so. As in the shoplifting cases, defendant did not have an unconditional possessory right to enter the victim's residence. Rather, he allegedly did so with the victim's uninformed consent, i.e., his lack of knowledge of defendant's felonious intent. Had the victim known thereof, he could have refused admission at the

threshold or ejected defendant after entry was accomplished. Consequently, defendant's alleged entry constituted burglary regardless of whether his intent 'to swindle the victim out of money by misleading him into buying unqualified securities' posed a physical danger to the victim.

"In effect, defendant would write into section 459 the requirement that the perpetrator must intend to commit a felony which poses a physical danger to the victim, rather than 'any felony' as specified by the Legislature. This interpretation is not compelled by the purpose of the burglary statutes as discussed above and would constitute impermissible judicial legislation. Moreover, it creates an unworkable test. Whether a felonious entry poses a physical danger to the victim is fact specific; it depends not on the particular felony, but on the sophistication of the perpetrator, the potential for detection, and the reactions of the victim and perpetrator if the felonious purpose is detected. It is not unreasonable to envision a fraudulent securities transaction where, upon probing questioning about the purchase, the victim discovers the illegality, attempts to call the police, and is attacked by the perpetrator. Other than speculation, how is one to determine whether such a potential threat existed in this case? On the other hand, there are residential burglaries which pose no physical danger to the victim, as where the perpetrator breaks into a house knowing the occupants are away on vacation. Would defendant argue this is not a burglary simply because it poses no physical threat to the victims?" (*Salemme, supra,* 2 Cal.App.4th at pp. 781-782, italics added, fn. omitted.)

To summarize, under the holdings of *Ravenscroft, Nible* and *Salemme,* defendant's act of placing the forged check through the security chute with felonious intent to steal money from the check-cashing facility constituted a burglarious entry. The forged check, an extension of defendant's arm or hand as it was placed in the chute, crossed into the air space of the business. (*Ravenscroft, supra,* 198 Cal.App.3d 639.) Under *Nible*'s test, the conclusion is inescapable that the owners or occupants of the check-cashing facility considered the air space within the security chute, through which they conducted all of their business, to be part and parcel of the air space of their business premises generally, as the chute was obviously purposefully designed to afford them "the protection the owners or inhabitants of a structure reasonably expect." (*Nible, supra,* 200 Cal.App.3d at p. 844.) And *Salemme* teaches that defendant's passing of the forged check through the air space of the targeted business constituted a burglarious entry regardless of whether his unlawful intent and actions posed any physical danger to the employee-occupants. (*Salemme, supra,* 2 Cal.App.4th at pp. 781-782.)

The majority, in contrast, turn these three explanatory authorities on their heads in concluding defendant's passing of the forged check through the air

space of the security chute was not a burglarious entry because such an act "is not using an instrument to effect an entry within the meaning of the burglary statute" and "[is] no different, for purposes of the burglary statute, than mailing a forged check to a bank or check-cashing facility." (Maj. opn., *ante*, at p. 722, fn. omitted.) I fail to see how our trial courts will be able to quantify, much less apply, the majority's nebulous new "test."

## IV

From a factual standpoint, defendant's passing of the forged check through the security chute posed an increased danger to the employee-occupants of the check-cashing facility as well as others in the vicinity. A check-cashing business is known by all to have a large amount of cash on hand; the nature of its business operation is to cash checks and hand cash out to its patrons. For this very reason its business is transacted through the walk-up window and security chute—in a sense, the only way for a patron to get "in" or "out" of the facility, i.e., transact business with it, is through the air space of the security chute. In this case, the alert teller sensed crime afoot and summoned police, who were able to arrest defendant at the crime scene without further incident. However, the potential for harm or violence always exists during a burglary and will vary with the circumstances. Although a walk-up window and security chute are specifically designed to discourage theft and robberies, there is no guarantee they will accomplish that end in every instance.

In any event, even assuming arguendo defendant's passing of the forged check through the security chute in actuality posed no direct threat of harm or violence to the business's employee-occupants, under the rationale of *Salemme* and similar authorities, that factor was *legally* irrelevant to the determination of whether a burglarious entry occurred. As *Salemme* suggests, a shoplifter who surreptitiously enters a store with the intent to steal commits burglary even though his or her clandestine effort to slip merchandise into a jacket does not necessarily threaten anyone's personal safety. (*Salemme, supra,* 2 Cal.App.4th at p. 781.) I fail to see why the majority's newly reformulated "test" finding no burglarious entry on these facts will not cast doubt on *Salemme*'s line of settled authority.[2]

The majority's holding today will further lead to anomalous results. Under the majority's rationale, if a person inserts a stolen ATM card into an ATM

---

[2]Although the majority purport to be disapproving only one aspect of the rationale of *Ravenscroft, supra,* 198 Cal.App.3d 639 (see maj. opn., *ante,* at p. 722, fn. 5), the majority's decision in this case effectively recasts the nature and scope of the element of "entry" required for burglary, and will likely have a far more widespread impact than the elimination of prosecutions for burglaries of ATM machines and businesses which conduct their operations through walk-up windows, chutes, or similar security devices.

In fact, the court in *Salemme, supra,* 2 Cal.App.4th 775, expressly cited and relied on the *Ravenscroft* decision, observing that, "Aside from shoplifting cases, there are numerous other

machine affixed to the exterior wall of a bank and succeeds in unlawfully withdrawing money from the cardholder's account, such is *not* burglary because the passing of the ATM card through the ATM machine is not an unauthorized entry of the sort the burglary statute is designed to prevent. (See maj. opn., *ante*, at p. 722.) But if that same person *walks into* the bank building with the stolen ATM card in hand, intending to perpetrate the same unlawful transaction at an ATM machine located *inside* the bank lobby, he *has* committed burglary at the moment he crosses the threshold of the building, and he can be arrested for that crime once inside the bank even if he never approaches the ATM or attempts the fraudulent transaction. The same anomalous results would obtain in comparing a business that has a walk-up window or security chute affixed to an external wall of the building, and one that admits patrons into a lobby but then requires them to transact business with their employees through openings in a secured or windowed counter area. In the former type of business, under the majority's rationale, the tendering of a forged check or similar fraudulent document through the external security chute is not burglary even if the suspect makes off with the loot, whereas in the latter business setting, a burglary would be complete when the suspect physically enters the lobby premises with felonious intent, without any further action necessary on his part to perfect his burglarious entry.

Yet another anomalous result that will flow from the majority's holding is that an *incomplete and unsuccessful attempt* at a forcible entry (i.e., inserting a crowbar or other burglar tool into the air space of a window, security chute mechanism, or ATM) will suffice as a legally sufficient entry for burglary, whereas a *completed and successful* nonforcible entry with a "tool or instrument" such as a stolen ATM card or forged check, by which the suspect nets his loot and makes his getaway, will *not*. The irony here is that those very businesses which, by their nature, are particularly vulnerable to theft and burglary, and for that reason protect themselves with anticrime devices such as walk-up windows, security chutes, or card access machines requiring passwords, will receive less protection in our courts if the burglar is caught and an attempt made to bring him to justice.

The majority find it significant that "in the present case, our reversal of defendant's conviction of burglary does not affect his convictions of forgery

---

decisions which have upheld burglary convictions where the entries with the intent to commit theft or a felony posed no physical danger to anyone. The most illustrative example is *People v. Ravenscroft* (1988) 198 Cal.App.3d 639 [243 Cal.Rptr. 827], in which the court held that the insertion of an automatic teller machine (ATM) card into an ATM to effectuate larceny constitutes burglary." (*Salemme, supra,* 2 Cal.App.4th at pp. 781-782, fn. 1.) I fail to see how the majority's decision today, and their express disapproval of *Ravenscroft*, will not impliedly disapprove the holding in *Salemme* and a host of related "conditional invitation" commercial burglary decisions.

and receiving stolen property, or his resulting sentence [therefor]." (Maj. opn., *ante*, at p. 723.) I fail to see the significance of this observation. The statutes proscribing check forgery and receiving stolen property have as their primary underlying purpose protection of the security interests of the original maker of the check and his bank. Defendant did not make the forged check out to himself, endorse it in his real name, or attempt to deposit it into his own bank account. Under such facts, forgery, and perhaps only forgery, would be his crime. Here, in contrast, defendant made the stolen check out to a fictitious payee and endorsed it with that fictitious name. From a practical standpoint, the forged check, as made out, had no value to defendant other than as a "tool or instrument" useable for the dual purpose of breaching the security system of the check-cashing facility (when it was accepted through the air space of the walk-up security chute) and as a paper "hook" to grab the loot (had the teller been tricked into cashing the forged check and handing money out to him through the chute).

Moreover, lest we forget, *every burglary* by definition has as an integral element the suspect's intent to commit a felony within the targeted premises. It would seem to beg the question to suggest, as do the majority, that conviction of burglary is unnecessary where conviction of the target felony (here forgery and receiving stolen property) is otherwise obtainable. Such circular reasoning would preclude the charging and conviction of burglary in many if not most burglary cases where the target felony (i.e., larceny) has been completed.

In sum, defendant's use of the forged check was no different than if he had "put a hand or a hook in at a window to draw out goods" from the victimized business, a clearly "burglarious entr[y]" even at common law. (See 4 Blackstone's Commentaries 227.)

I would affirm the judgment of the Court of Appeal. in its entirety.

Chin, J., and Brown, J., concurred.