Filed 8/4/25  P. v. Romero CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSE ROMERO,<br><br>Defendant and Appellant. | F085941<br><br>(Super. Ct. No. BF169466A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Eric L. Christoffersen and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found Jose Romero (defendant) guilty of murder and attempted murder.  He now challenges the admission of a statement by the surviving victim during her trial

testimony. Although the trial court erred in overruling an objection to the testimony, the error was harmless. Defendant also alleges instructional error, but those claims have no merit. The judgment will be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 20, 2017, police were dispatched to a neighborhood in Ridgecrest in response to a 911 call. The caller reported that an injured woman and her grandson came to his home seeking help and claiming the woman's husband was trying to kill them. Repeating information provided by the grandson, the caller identified the suspect as a 62-year-old man named Jose Romero, i.e., defendant. The caller also reported hearing gunfire, telling the dispatcher, "Shots are being fired …!"

Police responded to the residence of the 911 caller and spoke with defendant's wife. Several officers then went to the couple's nearby home. Defendant yelled at the officers from his front porch, repeatedly asking them to shoot and kill him. He was shirtless and standing approximately 10 to 15 feet away from an AK-47 rifle. Defendant eventually moved toward the rifle, which led to him being tackled and forcibly detained. He was transported to a hospital for injuries sustained during the arrest.

Police seized the semiautomatic AK-47 rifle, which was loaded with a single 7.62- by 39-millimeter cartridge. More ammunition was found inside the home. A few unfired .40-caliber bullets were located on the floor in the kitchen and dining area near drops of blood. Numerous live rounds of 7.62- by 39-millimeter ammunition were found scattered on the floor in another part of the residence. Police also recovered a .40-caliber Beretta handgun.

At the hospital, defendant waived his right to remain silent and submitted to a custodial interview. He described a history of marital problems stemming from his wife's lack of respect for him. She had taunted him with emasculating insults during a "big fight" that evening. He emphasized, "She offended me so badly." "No one has ever

2.

offended me like this. No one like her. No one." "She always offended me, …[b]ut today … was too much. This was too much."

Defendant admitted he tried to shoot his wife with a .40-caliber Beretta pistol. He specified the make and caliber of the gun without being told police had recovered the same type of weapon from his residence. Defendant vaguely explained that "nothing happened" when he pulled the trigger, i.e., the pistol did not fire. He told the officers, "So I threw the damn gun away and grabbed the rifle." Defendant admitted to striking his wife in the face before retrieving the second firearm.

While defendant was going for the rifle, his wife ran outside with her grandson yelling, "'Police, police, someone call the sheriff, call the sheriff, call the police[!]'" Defendant either saw or assumed they ran to the home of a next-door neighbor. After inserting an ammunition clip containing "three or four" rounds into his AK-47, he went to the neighbor's home and asked the woman who lived there, "[W]here's my wife?" Defendant further recounted, "So she says to me, 'Go away, you dog,' and I had the rifle and I shot her."

After shooting the neighbor in the stomach, defendant entered her home and called out for his wife. He searched one room, did not find her, and then returned to his own residence. Defendant ended his confession by stating, "I know that I have made a huge mistake." He also remarked about being "too old" to go to court and said he was ready to die by "lethal injection."

The police were surprised by defendant's story about the neighbor, as they had not known of any additional victims. When the interrogators asked for the woman's name, defendant told them, "Her surname is Rojas." Investigators went to the location defendant had described and found the dead body of Elsa Rodas. According to testimony, the body was found "just inside" of an open doorway to the home. An

3.

expended 7.62- by 39-millimeter casing was located near the body, also "just inside the doorway."

Another 7.62- by 39-millimeter casing was found on the floor of a bedroom in the decedent's residence, near a closet. A crime scene technician later testified to finding "items of clothing that had holes through them, and … a hole in the … wall of the closet," thus indicating someone had fired a bullet into the closet. The evidence was consistent with defendant's statements about entering the home and searching for his wife in one of the rooms.

In 2018, defendant was tried before a jury on charges of murder (Pen. Code, § 187; count 1), attempted murder (*id*., §§ 664, 187; count 2); assault with a firearm (*id*., § 245, subd. (a)(2); count 3); making a criminal threat (*id*., § 422; count 4); domestic violence with infliction of corporal injury (*id*., § 273.5, subd. (a); count 5); and child endangerment (*id*., § 273a, subd. (a); count 6). (All undesignated statutory references are to the Penal Code.) Defendant was acquitted on count 4 pursuant to section 1118.1. He was convicted on counts 3, 5, and 6, with true findings on gun enhancement allegations under section 12022.5, subdivision (a). An additional enhancement finding was made on count 5 pursuant to section 12022.7, subdivision (e).

A mistrial was declared as to counts 1 and 2. The jury hung by a vote of 11 to 1 in favor of conviction. Defendant was retried on both charges in 2023.

This appeal concerns the retrial of counts 1 and 2. Given the nature of defendant's claims, we provide only an abbreviated summary of the trial evidence. We refer to the attempted murder victim as defendant's wife even though she testified they "got divorced" prior to the second trial. Other parts of the record indicate the divorce was not finalized at the time of her testimony.

The wife confirmed that she and defendant argued on the night in question. What began as a verbal dispute suddenly escalated when defendant "took out a gun from … the

front [of his pants]" and pointed it at her face. She testified to seeing defendant pull the trigger. When the gun failed to discharge, he used it as a bludgeon. Defendant struck her twice in the head, causing lacerations that required medical treatment and multiple staples to close.

Defendant's wife also testified to fleeing from the residence with her 11-year-old grandson. They initially went to the home of Elsa Rodas. After knocking on the door and receiving no immediate response, they ran to the home of the 911 caller.

It was undisputed that defendant shot and killed Elsa Rodas with his AK-47 rifle. The People argued two theories of first degree murder. One was based on a premeditated intent to kill. The other was felony murder based on the predicate crime of burglary. More specifically, burglary with the intent to commit felonious assault and/or murder inside the residence.

The People's theory of attempted murder was based on the evidence of defendant's attempt to shoot his wife with the Beretta handgun. As a secondary argument, the prosecutor relied on the circumstantial evidence of defendant's actions inside the home of Elsa Rodas. Defendant was said to have believed his wife was hiding in the bedroom closet, and to have fired a bullet into the closet with the intent to kill her. The closet theory was also supported by testimony from defendant's adult daughter. Although called as a defense witness, she revealed defendant phoned her before the police arrived at his home and said, "[This is] probably the last time I'm going to talk to you. I shot [my wife]."

The defense relied on theories of provocation and voluntary intoxication. Defendant was portrayed as a bullied husband who finally snapped after enduring years of "emotional and psychological abuse" from his wife. This narrative was supported by the testimony of a domestic violence expert and several character witnesses who knew defendant to be a kind, honest, and peaceful man.

Defendant had no prior criminal record. Although he rarely consumed alcohol, a friend had persuaded him to drink on the day of the incident. In his recorded interview with police, which was played for the jury, defendant said he drank exactly six beers: four of one brand and two of another. When the police suggested alcohol may have affected his behavior, defendant said, "[O]fficer, that's not the problem. The problem is that she offended me." At trial, defendant testified to drinking more than six beers and getting too drunk to later remember certain details of the incident. The prosecutor argued his memory was conveniently selective.

The second jury convicted defendant of first degree murder and returned a true finding on a gun enhancement alleged under section 12022.53, subdivision (d). Defendant was also convicted of attempted murder, with true findings on enhancement allegations under sections 12022.53, subdivision (b), and 12022.7, subdivision (e). The trial court imposed an aggregate prison sentence of 50 years to life plus 15 years.

DISCUSSION

## I. Admission of Nonresponsive Testimony

### A. Background

Defendant alleges evidentiary error based on the following portion of his wife's trial testimony:

> "[WITNESS:] [H]e took it out, and then he aimed at my face. And then—and then again he repeated that I was a bitch and that things were going to end there.

> "[PROSECUTOR:] What did he do with the gun after he pointed it at you?

> "[WITNESS:] He was holding it with his right hand, and he was holding his finger on the trigger. He pulled it, but when he saw that nothing was coming out, with his other hand, he was doing something as if—I don't know, as if he was trying to remove something from it, but nothing came out.

6.

"[PROSECUTOR:] Did you personally see him pull the trigger with his finger?

"[WITNESS:] Yes.

"[PROSECUTOR:] Do you know enough about firearms to understand what that does?

"[WITNESS:] Well, a bullet was going to come out, and it was going to kill me.

"[DEFENSE COUNSEL]: Objection, Your Honor. Nonresponsive and asks for a conclusion.

"THE COURT: Overruled."

## B. Law and Analysis

Testifying witnesses must give responsive answers to the questions they are asked. (Evid. Code, § 766.) "When a question calls for a yes or no answer, the attempt to append an explanation to the answer is, strictly speaking, nonresponsive." (*People v. Navarro* (2021) 12 Cal.5th 285, 333.) Defendant's wife was asked if she knew "enough about firearms to understand" what happens when someone pulls the trigger of a gun. The question called for a yes or no answer, but the witness stated her belief about what would have happened if the Beretta had functioned as designed when defendant pulled its trigger. The testimony was nonresponsive.

Technically, the proper way to challenge a nonresponsive answer is by moving to strike the testimony. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1249.) Although defense counsel did not move to strike the witness's nonresponsive answer, counsel's objection preserved the issue for appeal. (See Evid. Code, § 353, subd. (a); *People v. Pollock* (2004) 32 Cal.4th 1153, 1181.) "An objection is sufficient if it fairly apprises the trial court of the issue it is being called upon to decide." (*People v. Scott* (1978) 21 Cal.3d 284, 290.) The issue is preserved for appellate review "if, despite inadequate phrasing, the record shows that the court understood the issue presented." (*Ibid.*)

7.

Defendant argues the challenged testimony "was tantamount to impermissible opinions that [he] attempted murder, had the specific intent to kill, and was guilty." He relies on the principle that lay witnesses are generally prohibited from giving opinion testimony about another person's state of mind. (*People v. Chatman* (2006) 38 Cal.4th 344, 397; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77 ["A witness may not express an opinion on a defendant's guilt"].) This claim was *not* preserved for appellate review. "A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal." (*People v. Marks* (2003) 31 Cal.4th 197, 228; e.g., *People v. Fuiava* (2012) 53 Cal.4th 622, 671 [objection to testimony as nonresponsive held insufficient to preserve claims the testimony was irrelevant and lacked foundation].)

Anticipating a forfeiture problem, defendant argues ineffective assistance of counsel (IAC) based on his trial attorney's failure to object on the grounds now asserted on appeal. The IAC claim is untenable because "[f]ailure to raise a meritless objection is not ineffective assistance of counsel." (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90.) Neither the prosecutor's question nor the witness's response addressed defendant's mens rea.

As discussed, the witness permissibly testified defendant pointed a gun at her head and pulled the trigger. The prosecutor then asked if she "kn[e]w enough about firearms to understand what [happens]" when the trigger of a gun is pulled. The witness expressed her understanding that pulling the trigger causes the gun to fire a bullet, and in doing so stated her belief about what would have happened if the gun had fired: "a bullet was going to come out, and it was going to kill me."

The physical consequences of being shot in the face at close range are the same regardless of whether the shooting is intentional or accidental, or whether the shooter's intent is legally negated by factors such as provocation and intoxication. The challenged

8.

question and answer did not address the issue of intent. Defendant cannot manufacture a new claim on appeal based on his own strained and self-serving interpretations of the record. (See *People v. Virgil*, *supra*, 51 Cal.4th at pp. 1248–1249 [rejecting appellant's characterization of nonresponsive testimony as improper lay opinion regarding the appellant's intent to commit robbery]; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [a judgment is presumed correct on appeal, "and all intendments and presumptions are indulged in favor of its correctness"]

The error correctly identified in trial counsel's objection was harmless. Erroneous admission of testimony is "subject to the standard of review for claims of state law error." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 76, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) We thus consider whether it is reasonably probable defendant would have obtained a more favorable outcome but for his wife's testimony about how guns work and the consequences of being shot in the head.

It is not reasonably probable the jury did not already know that pulling the trigger of a gun will cause it to fire a bullet. It is also not reasonably probable the jury did not know that being shot in the face at close range is likely to result in death. Even assuming jurors did not already possess this common knowledge, they heard properly admitted expert testimony about how guns, and specifically defendant's Beretta, function. The jury also heard properly admitted evidence that the homicide victim, Elsa Rodas, died from being shot once in the stomach. Any reasonably intelligent juror would have deduced that a single gunshot can be fatal.

The People's case-in-chief included testimony by a firearms expert. The expert testified to the basic mechanics of semiautomatic firearms, explaining that pulling the trigger of a loaded gun causes a firing pin to strike the primer of the ammunition. If the gun is functioning properly and no safety mechanisms are engaged, an explosive powder

9.

inside the casing will ignite, "causing a projectile to be sent out the muzzle of the firearm."

On cross-examination of the expert, defendant's trial counsel played videos depicting, in counsel's words, "how a semi-automatic weapon works." This established that manually "racking the slide" of the Beretta would have caused unfired cartridges to eject from the gun, thus explaining why unfired .40-caliber ammunition was found on the kitchen floor. Defense counsel later argued defendant merely "racked the gun to scare her."

There was no dispute over how guns operate, but rather whether defendant's wife actually saw him pull the trigger of the Beretta. She was impeached on this point with her own testimony from the first trial. Her prior testimony was that she "didn't have time to see" whether defendant pulled the trigger. The witness was further impeached with a video of her demonstrating for police what she had seen defendant doing with the gun (racking it by pulling the slide back and forth). Despite the apparent embellishment in her testimony at the second trial, the jury found defendant guilty of attempting to murder his wife. There is no likelihood of a different outcome but for the victim opining she would have died if the gun had fired when defendant pointed it at her head.

## II.    Alleged Instructional Errors

Defendant presents three claims of instructional error. We review his legal contentions de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) To the extent he argues the instructions were factually unsupported, we apply the substantial evidence test and view the record in the light most favorable to the judgment. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 408.) "Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.'" (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1049–1050.)

Two of defendant's claims relate to the felony-murder doctrine. When a crime victim is killed during the commission of certain inherently dangerous felonies, including burglary, the killer is statutorily liable for first degree murder. (§ 189, subd. (a); *People v. Powell* (2018) 5 Cal.5th 921, 942.) The elements of burglary consist of entry into a building (or various other enclosed spaces) with the intent to commit larceny or any felony. (§ 459; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1325.)

## A. First Claim

The jury was instructed on first degree felony murder based on defendant's killing of Elsa Rodas during the alleged commission of a burglary. The burglary instruction specified a theory of entry with the intent "to commit murder or assault with a firearm." Defendant argues the instructions were erroneous because, in his words, "the intent to assault with a firearm or to commit murder were assaultive in the merger doctrine context." Defendant relies on obsolete case law that was overturned by the California Supreme Court in 2009.

"The merger doctrine developed due to the understanding that the underlying felony must be an independent crime and not merely the killing itself. Thus, certain underlying felonies 'merge' with the homicide and cannot be used for purposes of felony murder." (*People v. Chun* (2009) 45 Cal.4th 1172, 1189.) Under the merger doctrine, "when the underlying felony is assaultive, … that felony always 'merges with the homicide' and cannot support a felony-murder conviction." (*In re Ferrell* (2023) 14 Cal.5th 593, 601.)

"The merger doctrine arose in the seminal case of [*People v. Ireland* (1969) 70 Cal.2d 522], and hence sometimes is called the '*Ireland* merger doctrine.'" (*People v. Chun*, *supra*, 45 Cal.4th at p. 1189.) The *Ireland* opinion holds "that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the

11.

prosecution shows to be an offense included in fact within the offense charged."
(*Ireland*, at p. 539, italics omitted.)  The merger doctrine was later extended, in *People v. Wilson* (1969) 1 Cal.3d 431, "to preclude convictions for first degree felony murder premised on a killing during the course of a burglary when the intended felony underlying the burglary was the assault that led to the homicide."  (*People v. Powell*, *supra*, 5 Cal.5th at p. 942, citing *Wilson*, at p. 440.)

In *People v. Farley* (2009) 46 Cal.4th 1053, the California Supreme Court unanimously concluded *Wilson* was wrongly decided.  (*Farley*, at pp. 1114–1119.)  As in this case, *Farley* involved a theory of felony murder based on the commission of burglary with the intent to commit assault with a firearm.  (*Id.* at pp. 1111-1113.)  The high court has expressly stated that *Farley* "reconsidered and disapproved the extension of the merger doctrine to first degree felony murder."  (*People v. Powell*, *supra*, 5 Cal.5th at p. 943; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 881–882.)  The inapplicability of the merger doctrine to first degree felony murder was also reiterated in *People v. Baker* (2021) 10 Cal.5th 1044.

In his reply brief, defendant alleges he "reads *Baker* differently" and "contends that a remnant of the merger doctrine remains even after *Farley* and *Baker*."  Those assertions are frivolous.  By "remnant" he apparently means a continuing applicability to theories of *second degree* felony murder.  (See *People v. Baker*, *supra*, 10 Cal.5th at p. 1107.)  The *Baker* opinion plainly states that "the merger doctrine no longer applies to first degree murder."  (*Baker*, at p. 1106; accord, *People v. Powell*, *supra*, 5 Cal.5th at p. 944 ["[W]e hold that defendant's argument fails because the merger doctrine is inapplicable to first degree felony murder"].)  Defendant's claim fails as a matter of law.

## B.     Second Claim

In his second claim, defendant alleges "[t]he evidence established that [Elsa] Rodas was killed before entry was made" into her home.  The evidence to which he refers

is his own trial testimony, wherein he described moving backwards from the victim's door before shooting her. Based on his version of the events, defendant contends "Rodas was already killed before the burglary's actus reus of entry occurred." The argument fails on both the facts and the law.

"For an entry to occur, a part of the body or an instrument must penetrate the outer boundary of the building." (*Magness v. Superior Court* (2012) 54 Cal.4th 270, 273.) "[T]he slightest entry by any part of the body or an instrument is sufficient …." (*Ibid*.) Examples include crossing the threshold with "'a hand or a hook …, or a pistol ….'" (*Ibid.*; see *People v. Wise* (1994) 25 Cal.App.4th 339, 345 ["[A]n entry occurs for purposes of the burglary statute if any part of the intruder's body, or a tool or instrument wielded by the intruder is 'inside the premises'"].)

Witness testimony and crime scene photographs indicated the victim's body and a shell casing from the bullet that killed her were found "just inside the doorway" to the home. The jury heard expert testimony and viewed demonstrative evidence regarding how casings would have been ejected from defendant's AK-47 when the rifle was fired. The location of the body and the fact all casings were found inside the home permits the inference of an entry, even if only by the barrel of the rifle, before or at the same time as the shooting. (See *Magness v. Superior Court*, *supra*, 54 Cal.4th at p. 277 ["[T]he requirement of entry is not difficult to satisfy; the slightest penetration will suffice"]; see generally *People v. Mumin* (2023) 15 Cal.5th 176, 202 ["The substantial evidence standard 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts'"].)

Moreover, as discussed in the respondent's brief, the crux of defendant's legal argument was rejected by the California Supreme Court in *People v. Horning* (2004) 34 Cal.4th 871. In *Horning*, the appellant argued that a bullet casing found at the murder

scene was located "just *outside* the house, suggesting he might have shot the victim outside before he first entered the house, i.e., before he actually committed the burglary." (*Id*. at p. 903.) "But for purposes of the felony-murder rule, it does not matter." (*Ibid*.)

"'[T]he killing need not occur in the midst of the commission of the felony, so long as that felony is not merely incidental to, or an afterthought to, the killing.' [Citation.] In addition, a homicide occurs in the perpetration of an enumerated felony for the purpose of the felony-murder rule if both offenses were parts of '"one continuous transaction."'" (*People v. Prince* (2007) 40 Cal.4th 1179, 1259.) "Thus, even if the jury found defendant had approached the victim's house with intent to commit burglary but killed the victim outside before consummating that burglary, it could still find him guilty of burglary felony murder." (*People v. Horning*, *supra*, 34 Cal.4th at p. 903.)

### C.    Third Claim

Defendant's third claim of instructional error is not easily explained. The People describe it as "nonsensical" or, at best, "difficult to decipher." Rather than struggle to paraphrase defendant's contentions, we reproduce the argument heading from his opening brief:

> "The trial court's instructions to the jury that burglary's intent permitted or required defendant intended to commit murder or firearm assault were erroneous when the prosecution proceeded on a theory that appellant attempted to murder [his wife] inside Rodas' house, which required express malice / specific intent to kill, could not coexist with implied malice, and could not be inferred from firearm assault's commission." (Underscoring omitted.)

Defendant appears to contend jurors somehow conflated the instructions for counts 1 and 2 and believed they could convict defendant of attempted murder without finding he acted with the intent to kill. We reject this claim for several reasons. First, it is defendant's burden to affirmatively demonstrate error (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573), and his contentions must be supported by "cogent legal

14.

argument" (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830). "One cannot simply say the [trial] court erred, and leave it up to the appellate court to figure out why." (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368.)

Second, jurors "are presumed able to understand and correlate instructions …." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Defendant does not rebut this presumption. His jury was instructed that "[e]ach of the counts charged in this case is a separate crime. You must consider each count separately …." Another instruction stated: "The act and the specific intent and/or mental state required are explained in the instruction for that crime or allegation." The instructions given for attempted murder tracked the language of CALCRIM No. 600 and clearly identified the requirement of an intent to kill. The jury did not ask any questions about the instructions or otherwise inquire about the applicable law.

Defendant alleges an unspecified error in the instructions on burglary and/or assault with a firearm, which were given only in relation to count 1, i.e., the murder charge. The lone instruction on implied malice was also given only in relation to count 1. Defendant cites to cases in which juries were misinstructed that attempted murder could be based on implied malice, which did not occur here. (E.g., *People v. Lee* (1987) 43 Cal.3d 666, 671 ["the trial court erred in giving conflicting instructions on the issue of specific intent to kill as it related to an attempted murder charge"]; *People v. Ratliff* (1986) 41 Cal.3d 675, 695 ["the trial court erred in instructing on implied malice in the context of attempted murder"]; *People v. Collie* (1981) 30 Cal.3d 43, 61 ["the trial court erred in instructing the jury that it could convict of attempted second degree murder despite the absence of a specific intent to kill"].)

Third, "a jury instruction cannot be judged on the basis of one or two phrases plucked out of context …." (*People v. Stone* (2008) 160 Cal.App.4th 323, 331; accord, *People v. Quinonez* (2020) 46 Cal.App.5th 457, 465–466.) "If reasonably possible, we

15.

will interpret the instructions to support the judgment rather than to defeat it." (*People v. Franco* (2009) 180 Cal.App.4th 713, 720.) Defendant does not identify any erroneous statements of law in the jury instructions, nor do we perceive any such infirmities.

"'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'" (*People v. Hin* (2025) 17 Cal.5th 401, 483.) Defendant's current complaints were not expressed at the time of trial. His claims may therefore be disregarded without further discussion. (*Ibid.*)

## DISPOSITION

The judgment is affirmed.

PEÑA, J.

WE CONCUR:

DETJEN, Acting P. J.

DE SANTOS, J.

16.